[Crim. No. 7240. In Bank. July 2, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. HAROLD ALLEN SPENCER, Defendant and Appellant.

Ivan E. Lawrence and Arvo Van Alstyne for Defendant and Appellant.

Stanley Mosk, Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—Defendant appeals (by operation of Pen. Code, § 1239, subd. (b)) from judgments of death and imprisonment imposed pursuant to jury verdicts finding him guilty of murder in the first degree and robbery while armed with a deadly weapon.

Defendant concedes—as he must, on the record of this case —that the evidence is sufficient to support the jury verdicts. He contends, however, that he was denied a fair trial by reason of a variety of asserted errors, relating principally to the conduct of the *voir dire* examination of the prospective jurors, the sufficiency of proof of the corpus delicti on the robbery count, the admission of certain evidence and the giving of certain instructions, alleged misconduct of the prosecutor in his closing arguments, and the adequacy of the deputy public defender's representation of defendant at the trial. We have concluded that these contentions are without merit and that the judgments of conviction should be affirmed.

By information defendant was charged in Count I with murdering Richard Heathman on May 5, 1962, and in Count II with robbing Heathman of four dollars while armed with a deadly weapon, a .38 caliber revolver. It was also charged that defendant had suffered two prior felony convictions for

violation of former Vehicle Code section 503 (theft or un-
lawful taking or driving of a vehicle, now Veh. Code, § 10851)
and had served terms of imprisonment for each offense.

The public defender was appointed as counsel. Defendant
entered pleas of not guilty and not guilty by reason of in-
sanity, and denied the prior convictions. The two alienists
appointed to examine him (Pen. Code, § 1027) filed their re-
ports stating that in their opinion defendant was sane at that
time and at the time of the alleged commission of the crimes.
At the start of trial defendant withdrew his insanity plea
and admitted the prior convictions.

On the guilt phase of the trial defendant neither took the
stand nor offered any evidence on his behalf. The prose-
cution called three eyewitnesses, as well as the arresting and
investigating police officers and experts, whose testimonies es-
tablished the following facts:

At approximately 10 p.m. on May 5, 1962, Istran Karkus
observed a Yellow Cab cross the intersection of 12th Street
and Dewey in Los Angeles, heading west on 12th, and come to
a stop at the right-hand curb some 20 feet from the corner.
The intersection was illuminated by an overhead light. Im-
mediately afterwards Mr. Karkus heard a shot, then saw de-
fendant step out of the right rear door of the cab and enter
the right front door; as the door opened the dome light inside
the cab went on and defendant reached up towards it. Mr.
Karkus entered his nearby house and telephoned the police.
Two or three minutes later he returned outside with his land-
lady, Mrs. Derkacz, where they met a neighbor, Mr. de Baca,
who had also heard the shot. The three then observed de-
fendant leave the cab by the right front door, walk 50 or 60
paces west on 12th Street, retrace his steps, take a blue canvas
hand bag from the cab,[1] and begin walking rapidly east-
wards. As he approached the next corner defendant was seen
to throw the bag into some bushes, then begin to run. Neither
before nor after the shooting did Mr. Karkus, Mrs. Derkacz,
or Mr. de Baca see anyone other than defendant in or near
Heathman's cab.

Police Officers Knapp and Stevenson arrived within min-
utes in a patrol car and arrested defendant, who had turned

---

[1]There was a minor conflict in this connection, as Mrs. Derkacz and
Mr. de Baca testified that defendant had the bag in his possession when
he first left the cab and began walking westwards; in all material re-
spects, however, the three eyewitnesses were in agreement as to what
transpired at the scene of the shooting.

onto Catalina and was then walking in a leisurely manner carrying his jacket on his arm. At the time of the arrest defendant was wearing khaki trousers and a sport shirt. There was wet, sticky blood on his hands and clothing, and in his trousers pocket were found a blood-stained handkerchief, four one-dollar bills sticky with blood, and some small change. The canvas bag was retrieved from the bushes and contained some clothes and toilet articles.

The cab driver, Heathman, was found slumped in the front seat, leaning against the left front door of his vehicle. He had been killed instantly by a gunshot wound through the head, the bullet having entered behind the right ear and exited in front of the left ear. There was considerable blood on the front seat and in the rear of the cab behind the driver. Samples of this blood were compared with the blood found on defendant's hands, clothing, handkerchief, and the four one-dollar bills; the samples all proved to be Type O.

A .38 caliber revolver was found in the rear of the cab on the right side, pushed down between the cushion and the back of the seat; the cylinder contained four bullets and an expended cartridge. (The gun had been stolen on the day before the shooting from a pickup truck belonging to a police officer.) A deformed bullet was found in the front of the cab; because of destruction of striation marks a ballistics test was inconclusive. The only identifiable fingerprints on the gun were those of the officer who first discovered it. A partial print of defendant's palm, however, was lifted from the rear right door.

The driver's wallet was in the front of the cab, lying on the passenger's (right) side of the transmission hump in the floor. The wallet contained identification cards showing that it belonged to Heathman, but no money. The driver's trip report showed that he had had a one-dollar fare between 9:30 and 9:35 o'clock that evening.

Defendant told a variety of stories to the police and the alienists. At the time of his arrest by Officer Knapp he explained the blood on his hands and clothing by saying he had cut his finger; but an examination of both of his hands and arms revealed no such cut or other wound. He denied having been in or near Heathman's cab at any time, and stated that he had been playing cards with some friends. When asked the address, he said that he could not remember it.

Two hours later, at the Wilshire police station, defendant told a different story to Officer Stevenson. Defendant then stated that he had had some drinks during the afternoon and

later had gone to a restaurant and met a man named "Reyes," and that the two of them had ridden around in cabs for a while. When asked if "Reyes" had been with him at the time of the shooting, defendant stated that he thought he was; that he (defendant) had been drowsing in the back of the cab and had not heard the shot; that someone awakened him and said, "Frisk the body"; that he had entered the front seat of the cab and had searched Heathman's body for money or valuables; and that he left when someone said, "People are coming. Let's get out of here." Defendant told the officer that he had first met "Reyes" at Folsom; he also denied that the blue canvas bag found in the bushes was his.

Shortly thereafter defendant was further questioned by Sergeant Meade and Officer Wilkerson, and their conversation was recorded on tape. With the exception of a certain portion deleted by stipulation (referring to defendant's prior convictions), the recording was played to the jury. Defendant repeated substantially the same story that he had told Officer Stevenson, adding that he had entered the cab after agreeing to a proposition by "Ramos" (elsewhere referred to by defendant as "Reyes" or "Rejos") that they rob a grocery store together. In the course of the conversation defendant again denied owning the blue canvas bag, saying, "it's not mine and that's the truth." Two days later, while being transported to the Central Jail, defendant admitted having purchased the canvas bag about a week before from "some fellow downtown."

Sergeant Meade subsequently directed a letter to the Department of Corrections in an effort to track down "Ramos" (or "Reyes" or "Rejos"), but was unable to accomplish any related additional investigation on the basis of the department's response. Two months after his arrest defendant told Dr. George W. Abe, one of the examining alienists, that he "had never met a person by the name of Reyes in Folsom" and that he "had never known anyone by the name of Reyes."

The jury returned verdicts finding defendant guilty as charged of murder and armed robbery. On the penalty phase the People introduced no further evidence other than certified copies of defendant's prior felony convictions. Defendant took the stand; he denied remembering the events of the night of the crimes, but in response to the question "Is there any doubt whatsoever that you were inside that taxicab?"

defendant answered, "No, sir, there is not." Defendant was then asked, "Do you know such a person as Ramos or Reyes, or any other name that that person was referred to?" Defendant answered, "No, I can't recall anyone—I don't even know why I would even mention it, actually. I can't recall knowing anyone by that particular name." The jury fixed the penalty at death on the murder count, and judgment was pronounced accordingly.

Defendant predicates misconduct on certain portions of the prosecutor's *voir dire* examination of the prospective jurors. Defendant complains of the fact that the prosecutor "flatly advised" such jurors that as the representative of the People he expected to ask for the death penalty, and then asked certain of the jurors whether they had a personal conception of "what a proper case for the imposition of the death penalty might be" and if so, whether they would be able to recognize such a case if it were presented to them. Defendant argues that "the prosecutor here was evidently attempting to implant the notion in the mind of the jury that since he, the experienced prosecutor, had concluded that this was a death sentence case and since he intended to ask for a death sentence, any juror who understood what was a proper case for such a sentence would also necessarily agree that this case was such a proper case." On this basis defendant claims that the subject line of questioning "pre-committed the jury to a death sentence."

The record does not bear out this contention. ▮▮▮ The trial court in its opening examination for cause informed the jurors of the charges against defendant and correctly asked, "Do any of you have a conscientious objection to the imposition of the death penalty *in a proper case?*" (Italics added.) Counsel for defendant and for the People then conducted their *voir dire* examinations. A representative sample of the prosecutor's inquiry on this particular issue is set forth in the footnote.[2] From questions such as these the jurors

---

[2] "Q. [by the deputy district attorney]: Now, you appreciate that the law leaves it up to your own good conscience and discretion to decide whether the death penalty is proper.

"The phrase in quotes 'proper case' has been used.

"Let me ask you this question: Do you have any concept of your own, no matter how ill-defined, as to what a proper case might be? You don't have to tell me what it is. You can answer the question yes or no, if you can. A. [a prospective juror]: I believe I do.

"Q. All right. Of course you have no knowledge at this time as to whether or not this is a proper case or not, but it might be; is that correct? A. It could, yes.

could not reasonably have felt that they were in any way "pre-committed" to the death penalty. Rather, it appears that the prosecutor sought merely to call to the prospective jurors' attention the responsibility they were facing and the fact that if not excused from service they would be expected to discharge that responsibility on a rational basis. Here, as in *People* v. *Pike* (1962) 58 Cal.2d 70, 87 [11] [22 Cal. Rptr. 664, 372 P.2d 656], "the prosecutor appears merely to have performed his duty to ascertain that prospective jurors were not disqualified within the purview of [Penal Code] section 1074."[3]

 Nor is there any evidence in the record of the alleged attempt of the prosecutor to "implant" in the minds of the accepted jurors the notion that "any juror who understood what was a proper case for such a sentence [i.e., the death penalty] would also necessarily agree" with the prosecutor

---

"Q. I ask you this question because there are some people who might' say that they would return a death penalty in a proper case with the mental reservation that a proper case would be an attack upon some citizen in this community by Martians, and of course, that would have no practical application in any courtroom of this County, would it? A. (The juror shakes her head negatively.)

"Q. At least we hope not.

"All right. I take it, then, that if you find this to be a proper case there is nothing that will deter you from reflecting that decision in your verdict; is that correct? A. (The juror nods her head affirmatively.)"

[3]Section 1074 provides in relevant part that "If the offense charged be punishable with death" a challenge for bias may be taken as to a prospective juror for "the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror." When the forerunner of this section was first enacted the related punishment section (Comp. Laws of California, 1850-1853, p. 640, § 21) provided (in relevant part) that "The punishment of any person convicted of the crime of murder shall be death." Likewise, when section 1074 was first enacted (1872) as a part of the Penal Code, section 190 of that code specified that "Every person guilty of murder in the first degree shall suffer death . . . ." In 1874 (Amends. to the Codes, 1873-1874, p. 457) section 190 was amended to read "Every person guilty of murder in the first degree shall suffer death, or confinement in the State Prison for life, at the discretion of the jury . . . ." (*People* v. *Green* (1956) 47 Cal. 2d 209, 218 [5] [302 P.2d 307].)

Implementing section 1074 in the light of section 190 as amended, the rule is settled that "a prosecutor in a case where the death penalty may be imposed clearly has the right to ascertain the views of the potential jurors [citations] so that he can intelligently exercise his challenges against those whose consciences would preclude them from imposing this penalty. [Citations.]" (*People* v. *Wein* (1958) 50 Cal.2d 383, 394 [1] [326 P.2d 457].) Defense counsel, of course, is "entitled to equal scope in ascertaining that prospective jurors can serve with like fairness to the defendant." (*People* v. *Pike* (1962), *supra*, 58 Cal.2d 70, 86 [7].)

that the present case was such.[4] The prosecutor's statement that "I have an obligation, I think, to tell all prospective jurors here at the outset that if the evidence in this case develops as anticipated the People will ask this jury for a death penalty" was, as we observed in *People* v. *Pike* (1962), *supra,* 58 Cal.2d 70, 88 [13], "commendable rather than improper." Having been thus informed, the jurors must have understood that the prosecutor believed that the evidence would show the present case to be a "proper one" for the death penalty; yet the prosecutor was careful, in asking the questions hereinabove quoted (fn. 2), to inquire only whether the juror had a concept "of your own" as to what a proper case might be. Thereafter the prosecutor made it clear that each juror would be expected to determine the penalty in accordance with that juror's personal standard, emphasizing that "during the penalty phase of the case the only standard that is going to be given to you is a personal one to exercise your own discretion and your own sound judgment and to satisfy your own good conscience." And at the People's request the jury were instructed on the penalty phase that "Your verdict must express the individual opinion of each juror." No misconduct is therefore made to appear.

As noted at the outset, defendant concedes that the evidence is sufficient to support the verdicts of guilty on each count. Yet as to the charge of robbery (Count II) defendant contends that his guilt is shown only by his incriminating admissions to the police and that "there was no evidence tending to establish the corpus delicti" on that count. The record refutes this contention. A prima facie showing of the corpus delicti is all that is required for the introduction of incriminating admissions, and that showing may be by circumstances and legitimate inference. (*People* v. *Powell,* (1949) 34 Cal.2d 196, 203 [2] [208 P.2d 974]; *People* v. *Childs* (1962) 201 Cal.App.2d 600, 603 [1] [20 Cal.Rptr. 109]; *People* v. *Luckman* (1961) 198 Cal.App.2d 347, 352 [8] [18 Cal.Rptr. 167].) Here there was evidence (1) that defendant was the only person seen in or about Heathman's cab; (2) that immediately after the shooting defendant entered the front of the cab on the passenger side and

---

[4]It is noteworthy that out of the twelve jurors finally selected, only four were actually questioned in the manner here complained of. Also relevant as dispelling any implication that the prosecutor "packed" the jury is the fact that he accepted the jury as constituted on no less than nine occasions before the defendant finally voiced his own acceptance, allowing the trial to proceed.

remained there for several minutes; (3) that Heathman's wallet was found not on his person but on the front floor of the cab, and more precisely on the passenger's side of the transmission hump; (4) that the wallet was empty, although Heathman's trip report showed that he had had a one-dollar fare only a half hour before the murder; and (5) that four blood-stained one-dollar bills were found in defendant's pocket when he was arrested minutes after he left the cab, the blood being of the same type as Heathman's. The foregoing evidence constituted at least a prima facie showing that defendant had robbed Heathman of four dollars as charged in Count II, and the trial court could reasonably have so concluded.

Defendant contends that it was error to allow the jury to hear the hereinabove mentioned tape recording of the questioning of defendant by Sergeant Meade and Officer Wilkerson on the night of the crimes. Defendant concedes that relevant sound recordings are admissible in evidence provided that a proper foundation is laid (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 333-334 [18] [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Vetri* (1960) 178 Cal.App.2d 385, 395 [8-9] [2 Cal.Rptr. 795], and cases there cited), but argues that three elements of a proper foundation were here lacking. The contention, as will next be explained, is without factual support.

■ First, defendant asserts that there was "no evidence whatever as to the manner in which the tapes were recorded, as to the capacity of the recording machine to make an accurate recording of the conversation, nor as to the competency of the operator of the machine." Prior to introducing the tape recording into evidence, however, the deputy district attorney examined the interrogating officer in the manner set forth in the footnote.[5] In several recent cases similar testimony has been held sufficient foundation on the issue of the authen-

---

[5]"Q. [by the deputy district attorney]: You are an investigating officer in this case? A. [Sergeant Meade] Yes, sir.

"Q. In that capacity did you and your partner have a conversation with this defendant in the early morning hours of the 6th of May, 1962? A. Yes, sir.

"Q. Where did the conversation occur? A. That conversation took place in an interview room within the Detective Bureau itself at Wilshire Station. . . .

"Present was the defendant, Officer Wilkerson, and myself.

"Q. When did this conversation commence? A. This conversation started at 1:40 a.m. that morning.

ticity of a tape recording (see, e.g., *Todisco* v. *United States* (9th Cir. 1961) 298 F.2d 208, 211 [4], cert. denied 368 U.S. 989 [82 S.Ct. 602, 7 L.Ed.2d 527]; *People* v. *Rosoto* (1962), *supra*, 58 Cal.2d 304, 333-334 [18]; *People* v. *Dupree* (1957) 156 Cal.App.2d 60, 68 [9] [319 P.2d 39]). Had defendant been unsatisfied with the foundation here laid he could have so indicated by timely objection or by cross-examination on this point; his failure to do either[6] bars him from now complaining that a more technical description of the recording process was not elicited from the witness.

Secondly, defendant contends that there was no showing that the recording was complete, accurate, and intelligible. As defendant acknowledges, Sergeant Meade testified that the recording fairly and accurately reproduces the subject interrogation in its entirety, and that one can hear and understand the contents of the tape (*ante*, fn. 5); similar testimony has been held to be an adequate foundation on the issue of the accuracy of a recording (see, e.g., *Todisco* v. *United States* (9th Cir. 1961), *supra*, 298 F.2d 208, 211 [4]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 517 [2a] - 518 [2b] [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Rosoto* (1962), *supra*, 58 Cal.2d 304, 333-334 [18]; *People* v. *Jackson* (1954) 125 Cal.App.2d 776, 779-780 [4b] [271 P.2d 196]). But defendant argues that when the tape was actually played

---

"Q. Is the room in which this conversation took place wired for sound? A. It is.

"Q. Was a recording made of the conversation? A. It was.

"Q. Everything that was said, is that correct, sir? A. Yes, sir.

"Q. You have since had an opportunity to hear that recording of that conversation? A. I have.

"Q. And you heard the recording of that conversation at a time when your own impression of the conversation was fresh in your mind; is that correct, sir? A. Yes, sir.

"Q. Did the recording fairly and accurately set forth the conversation between you officers and this defendant in its entirely? A. It did.

"Q. Do you have the tapes of that conversation here in the courtroom and on a machine on which to play the tapes? A. Yes, sir, I do.

"Q. And these tapes are pretty good ones, as far as interrogations go? A. Yes, sir.

"Q. That is to say, you can hear them and understand them? A. Yes, sir."

The witness also identified the voices heard in the recording, before it was played to the jury.

[6]Defendant's sole objection to the use of the recording was that it was inadmissible on Count II (robbery) because "there has been no proof of the corpus delicti." That objection, as has been shown, was properly overruled. In fairness to defendant's trial counsel, however, it should be pointed out that he cross-examined Sergeant Meade at length on the content of the interrogation itself, and also questioned the officer with respect to the failure to administer a "paraffin test" to defendant's hand (to aid in determining whether he had recently fired a gun).

to the jury "it proved to be very substantially deficient, being filled with unintelligible and inaudible parts." The basis of this assertion is, admittedly, *the reporter's transcript* of the recording: defendant's counsel on appeal (who did not try the case) emphasize that their reading of the transcript "discloses the startling information that there were 162 instances in which the official court reporters were unable to transcribe what was said on the tape!" Relying on *People* v. *Stephens* (1953) 117 Cal.App.2d 653, 661-663 [1c] [256 P.2d 1033], it is urged that the use of such an "unintelligible" recording may have resulted in a denial of a fair trial.

The facts appear to be otherwise. The tape is an exhibit (Ex. 33) in the record before this court, and we have listened to it and compared it with the transcript. Of the 162 instances (by counsel's count) in which the reporters deemed the tape to be in some way "unintelligible," virtually every one is in fact clear and comprehensible.[7] By way of explanation it should be observed that rather than transcribing the tape directly from a playback machine outside of the courtroom, the reporters were requested to "do the best they can to take [the tape] down" while it was being played to the jury during the trial. Assuming that the reporters conscientiously attempted to perform their duty, it can only be concluded that they were not properly placed to hear the playing of the tape. This would also tend to explain why, in a number of the passages that the reporters did transcribe, the transcription corresponds only approximately with the actual words spoken, although preserving their general tenor.

But these shortcomings in the preparation of this portion of the transcript on appeal are of no succor to defendant, for several reasons. First, it bears emphasis that here, as in *People* v. *Jackson* (1954), *supra,* 125 Cal.App.2d 776, 779 [4a], "There was no complaint from any member of the jury that they could not hear and understand the playing of the recordings. . . . We may assume the machine and the loud speaker were placed so as to give the jury the best possible opportunity to hear and understand the recordings—a better opportunity than counsel [or the reporters] had. Since there was no complaint from the members of the jury it is a fair inference that they heard and understood the record-

---

[7]In a few isolated instances the tape is unclear because it happened, as in any conversation, that one person interrupted another and the two spoke a few words simultaneously. Even then, however, the gist of what was said is clear from the context.

ings."[8] Moreover, it is apparent that the counsel who were present at the trial had no question as to the audibility or intelligibility of the recording. Indeed, prior to playing this tape to the jury defendant's trial counsel listened to it himself, and was able to stipulate with the deputy district attorney that a certain portion thereof (referring to defendant's prior convictions) was objectionable and hence would be omitted from the playing; manifestly, counsel who heard the tape were of the opinion that it was *not* unintelligible. (Cf. *People* v. *Ketchel* (1963), *supra*, 59 Cal.2d 503, 519 [2b].)[9]

The third element of the foundation assertedly missing in the case at bench "is a showing that the recorded statements were fully voluntary." Defendant points out that there is no showing in the record that defendant was represented by counsel at the time of the interrogation; but this fact does not of itself render the defendant's statements inadmissible. (*People* v. *Garner* (1961) 57 Cal.2d 135, 149 [12] [18 Cal.Rptr. 40, 367 P.2d 680] ; *id.* at pp. 156-166 (concurring opinion by Traynor, J.).) It is true that Sergeant Meade was not specifically asked if the statements of defendant during the recorded interrogation were voluntary, but this appears to have been merely an oversight on the part of the deputy district attorney. Another witness, Officer Stevenson, previously testified that the statements of defendant during his first interrogation (shortly after his arrival at the police station) were "freely and voluntarily" made; and defendant did not object on that ground. The recorded interrogation by Sergeant Meade took place only minutes later, and there is nothing in the record or in that interrogation to suggest that anything transpired in the interim to render involuntary that which had just been voluntary; again, defendant did not object on that ground.

---

[8]This fact distinguishes *People* v. *Stephens* (1953), *supra*, 117 Cal. App.2d 653, 661 [1c], where ''On one occasion, while the recordings were being played, a juror interrupted to inquire, 'Did he say ''stole'' or ''sold'' the car?' to which the court replied: 'You will have to get that from the record—I won't interpret.' ''

[9]While it might ordinarily be the better practice, as suggested by defendant (see also *Todisco* v. *United States* (9th Cir. 1961), *supra*, 298 F.2d 208, 211 [4], quoting from *Monroe* v. *United States* (D.C. Cir. 1956) 234 F.2d 49, 55 [4-6]; *People* v. *Ketchel* (1963), *supra*, 59 Cal.2d 503, 518 [4]), for the trial court to listen to such recordings before playing them to the jury in order to rule in advance on objections to their completeness, accuracy, or intelligibility, that requirement obviously should not be imposed when, as here, none of the parties who had heard the tape voiced any objections on those grounds.

Yet relying on *the reporter's transcript* of the tape recording, defendant's counsel on appeal pick out three unconnected remarks made by the officers during the questioning and characterize them as "veiled threats or at least a form of psychological coercion." It may be doubted that this contention would have been made in the briefs if defendant's counsel on appeal had had the benefit of an audition of the recording. One has but to listen to the tape to perceive that no coercion, psychological or otherwise, appears to have been employed at any point; rather, it is manifest that the officers quietly and unhurriedly questioned defendant concerning his knowledge of the crimes in which he was implicated and that the remarks now emphasized were simply expressions of the officers' understandable impatience with defendant's seemingly very selective memory.

Defendant contends that the deputy district attorney was guilty of misconduct during the guilt phase of the trial in allowing or eliciting references by several witnesses to defendant's story that he had known "Ramos" (or "Reyes" or "Rejos") *at Folsom*.[10] It will be remembered that defendant admitted his two prior felony convictions at the start of trial but out of the presence of the jury. Defendant now contends that the above quoted references to his story of knowing "Ramos" at Folsom amounted to disclosures to the jury of the fact that he had suffered such prior convictions, and that these disclosures were in violation of Penal Code section 1025.

The contention is unsound. Penal Code section 1025 provides in relevant part that "In case the defendant pleads not guilty, and answers that he has suffered the previous conviction, the charge of the previous conviction must not be read to the jury, nor alluded to on the trial." While the testimony in question (*ante*, fn. 10) did not specifically mention any "charge of the previous conviction," the jury might well have inferred that defendant's past connection with Folsom was

---

[10]Dr. George W. Abe, one of the alienists appointed to examine defendant on his insanity plea, testified that defendant "mentioned he had never met a person by the name of Reyes in Folsom." After defendant's objection was argued and overruled, Dr. Abe explained, "I asked him if he had met him ['Reyes'] in Folsom, which was in the preliminary transcript, and he said, 'No.'"

Officer Stevenson, relating his conversation with defendant that took place shortly after the arrest, testified that "He said that he met him ['Reyes,' etc.] at Folsom." And Sergeant Meade subsequently acknowledged that defendant had told him "he had known this individual previously in Folsom."

as an inmate rather than a visitor. Ordinarily, therefore, the use of such testimony would tend to violate at least the spirit of section 1025; and in the absence of special circumstances such as here present, it would be error to allow the jury to hear it. ■ Section 1025 represents a fundamental declaration of public policy, and its provisions when relevant must be scrupulously observed by all prosecuting attorneys. In the case at bench, however, defendant by his own conduct voluntarily put in issue the matter of which he now complains. ■ It is settled that section 1025—while salutary in purpose—"was not designed to exclude relevant evidence" *(People* v. *Peete* (1946) 28 Cal.2d 306, 320 [6] [169 P.2d 924], cert. denied, 329 U.S. 790 [67 S.Ct. 356, 91 L.Ed. 677], 331 U.S. 783 [67 S.Ct. 1185, 91 L.Ed. 1815]; accord, *People* v. *Santa Maria* (1962) 207 Cal.App.2d 306, 314 [7] [24 Cal.Rptr. 492]). ■ Here the subject testimony was specifically offered "for the inconsistency of the statements, your Honor, to demonstrate to the jury that the defendant was fabricating." That purpose was a proper one; defendant's diametrically inconsistent statements concerning his acquaintance with "Ramos" (or "Reyes" or "Rejos") tended logically and by reasonable inference to cast serious doubt on the truthfulness of the exculpatory story he told the officers shortly after his arrest, and hence to show consciousness of guilt. Defendant argues that this inconsistency could have been brought out without mentioning the location of the asserted meeting, i.e., Folsom; but the latter information (which was *volunteered by defendant,* it bears remembering) was relevant as emphasizing that the inconsistency of these statements was complete and extended to each circumstance there related, leaving no possibility of their reconciliation. In these circumstances the court did not err in overruling defendant's objections to this language.

■ Defendant attacks on still another ground the admissibility of quoted testimony *(ante,* fn. 10) of Dr. George W. Abe relating to statements made by defendant in the course of the psychiatric examination on his plea of not guilty by reason of insanity. Defendant contends that it was error to allow Dr. Abe to so testify on the guilt phase, in view of the fact that defendant had withdrawn his insanity plea at the start of trial. Defendant argues that the admission of such testimony "tends to vitiate" the purpose of Penal Code section 1027 *(post,* fn. 12) in that "the possibility of a free and candid interview with the alienist is impaired" if the defendant knows that his statements in that interview may be

introduced on the guilt phase of the subsequent trial;[11] secondly, defendant argues that the admission of this testimony violates his privilege against self-incrimination. Each of these arguments, however, has been recently considered and rejected by this court (*People* v. *Ditson* (1962) 57 Cal.2d 415, 447 [23a] - 448 [23b] [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Combes* (1961) 56 Cal.2d 135, 149 [17] - 150 [20] [14 Cal.Rptr. 4, 363 P.2d 4]) and no persuasive reason is suggested for disturbing the conclusions there reached.

Thirdly, defendant advances the argument that the admission of such testimony "would tend to create an invidious discrimination against indigents solely because of their poverty" and hence violates the equal protection clause (citing such cases as *Griffin* v. *Illinois* (1956) 351 U.S. 12, 16 [76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055], and *Douglas* v. *State of California* (1963) 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811]). Defendant points out that admissions of an accused to a physician privately employed by his counsel for the purpose of examining him in preparation for trial are held to be protected by the attorney-client privilege (*Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 60-61 [8] [22 Cal.Rptr. 879, 372 P.2d 919]); on this basis defendant argues that he was denied "equal protection" because he had insufficient funds to hire such a physician of his own and hence take advantage of that protection. But by its terms section 1027 operates in the same manner whether the defendant be rich or poor, because in either event it compels the use of *court-appointed* alienists when a plea of not guilty by reason of insanity is entered.[12] Obviously, the statute seeks the relevant truth—and makes it equally available—as to rich and poor alike. Defendant attempts to overcome this flaw in his position by further proposing that "Had defendant been a man of wealth and means, he *would have presumably* not entered a plea of insanity at all; for his privately employed psychiatrist *would already, presumably,* have reported to

---

[11]There is no showing in the record that defendant knew that his statements might be thus used.

[12]Section 1027 of the Penal Code provides in relevant part: "When a defendant pleads not guilty by reason of insanity *the court must select and appoint* two alienists, at least one of whom must be from the medical staffs of the state hospitals, . . . to examine the defendant and investigate his sanity. *It is the duty of the alienists so selected and appointed* to examine the defendant and investigate his sanity, and to testify, whenever summoned, in any proceeding in which the sanity of the defendant is in question." (Italics added.)

employed counsel that there was no basis for such a plea.'' (Italics added.) Whether counsel might nevertheless, in the proper exercise of the discretion which evolves from his responsibility, have felt it advisable to enter, and further explore the tenability of, such a plea would still appear conjectural. ▇ We take judicial notice of the fact that the plea of not guilty by reason of insanity has been more often entered than sustained. An established practice of the trial courts such as here challenged, grounded on an enactment of the Legislature and sanctioned by our decisions, will not be struck down on rank speculation alone. (Cf. *In re Cregler* (1961) 56 Cal.2d 308, 313 [6] [14 Cal.Rptr. 289, 363 P.2d 305].) Defendant's argument, in essence, amounts to no more than an unwarranted criticism of the manner in which his trial counsel conducted this aspect of the defense.

▇ Defendant contends that the trial court abused its discretion in allowing into evidence two colored photographs showing Heathman slumped against the left front door of his cab. (Ex. 31.) Defendant asserts that these photographs are ''gruesome'' and that their ''inflammatory'' effect on the minds of the jurors outweighed ''their minimal probative value.'' The contention is without merit. Here, as in *People* v. *Darling* (1962) 58 Cal.2d 15, 21 [8] [22 Cal.Rptr. 484, 372 P.2d 316], ''We have viewed the photographic exhibits and are satisfied they cannot be characterized as gruesome, nor can it reasonably be said that they illustrate relevant factual matters in a manner unfair to defendant.'' Their probative value in the case at bench is considerably more than ''minimal.'' In his argument to the jury the prosecutor said, ''We know Mr. Heathman was in the cab and I will ask you to look at the pictures, People's 31, and you will see why Mr. Heathman was not visible to Mr. Karkus.'' The credibility of Karkus' testimony that *no one* but defendant was visible in the cab at the time of the shooting was important to the People's case, and the subject photographs corroborate that testimony by demonstrating why the victim was not also visible after the shot was fired. No abuse of discretion appears. (*People* v. *Darling* (1962), *supra,* 58 Cal. 2d 15, 21 [6-8]; *People* v. *Ditson* (1962), *supra,* 57 Cal.2d 415, 446 [20].)

▇ Defendant contends that the giving of certain instructions on the issue of the corpus delicti of Count II (robbery) had the effect of erroneously withdrawing from the jury consideration of facts relevant to that issue. The

contention is unsound. In his closing argument defendant's counsel urged the jury to disregard defendant's statements to the police if they found that the corpus delicti of the robbery had not been proved by evidence other than these statements. (As shown hereinabove, there was sufficient "other evidence" to justify the court in admitting these statements over defendant's objection.) The deputy district attorney apparently was caught by surprise, and in reply told the jury that this was "a somewhat novel question" and that "Generally speaking, the corpus delicti of a crime is no business of the jury at all, so far as I know." He continued: "Since Mr. Littlefield [defendant's counsel] has made this statement and suggested to you, in effect, that there is no corpus delicti, it is incumbent upon me to say something about it, although it seems to me that I am talking about a question of law which is really, strictly speaking, none of your business." These remarks were inaccurate and unfortunate, and considered alone appear to suggest an incorrect understanding of the jury's function in evaluating evidence of the corpus delicti. But the prosecutor immediately went on to correct that implication (if any) by properly informing the jury of the elements of the corpus delicti and the quantum of proof necessary to establish them, and by detailing to the jury the evidence by which the People had sought to prove each of those elements. Any remaining misunderstanding of the jury must be deemed to have been dispelled by the giving of a standard instruction correctly defining the jury's duty in this respect (CALJIC No. 29-C).

Defendant now complains that a conflict arose because the court also instructed the jury that "Whether offered evidence is admissible is purely a question of law." But the latter instruction is correct; it was requested by defendant as well as the People; and in the context in which it was given (CALJIC No. 6) no conflict with the corpus delicti instruction could reasonably have arisen in the jurors' minds.

After one and three-quarter hours of deliberations the jury were recalled to the courtroom and were read an additional instruction on corpus delicti offered by the People.[13] Defendant complains that this instruction con-

---

[13] "The corpus delicti must be proved by evidence outside the extrajudicial declarations and statements of the defendant, but to authorize the reception of such declarations and statements in evidence and their consideration by the jury, the prosecution is not required to establish the corpus delicti by proof as clear and convincing as is necessary to establish the fact of guilt; rather slight or prima facie proof is sufficient for

flicted with the first one given on corpus delicti (CALJIC No. 29-C) and was erroneous because it "invaded the province of the jury." The point is not well taken. As the prosecutor explained in offering this second instruction, the jury had not been charged as to one of the issues discussed in argument, i.e., the quantum of proof sufficient to establish the elements of the corpus delicti; the latter instruction (fn. 13) was responsive to that issue, and hence was properly given. (Pen. Code, § 1093.5.)

▇▇▇ It is contended that the instruction given on the subject of intoxication "deprived defendant of the benefit of his defense of lack of specific intent on the robbery count." On the basis of evidence hereinafter described, the court instructed the jury on intoxication in the terms of CALJIC No. 78.[14] Defendant concedes that the first paragraph of this instruction correctly stated the law (Pen. Code, § 22), but argues that the second paragraph thereof conflicted with the first "for the jury was told, in effect, to disregard the evidence of defendant's intoxication." It is true that on anything less than a careful and comprehensive consideration of the related instructions there would appear to be a conflict on the face of CALJIC No. 78 (*ante*, fn. 14). It is also true that upon analysis of the language of No. 78 in the light of such other instructions the conflict becomes more apparent than real; i.e., the second paragraph of No. 78, considered in context of the whole, serves to explain the rule concisely stated in the first sentence of Penal Code section 22, quoted in the first paragraph. In this connection the jurors were specifically instructed that "you are not to single out any

___

such purpose. It may be proved by circumstantial evidence and by inferences reasonably drawn therefrom."

[14]CALJIC No. 78 reads:

"Our law provides that 'no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.'

"This means that drunkenness, if the evidence shows that the defendant was in such a condition when allegedly he committed the [a] crime charged, is not of itself a defense in this case. It may throw light on the occurrence and aid you in determining what took place, but when a person in a state of intoxication, voluntarily produced by himself, commits a crime such as that [any of those] charged against the defendant in this case, the law does not permit him to use his own vice as a shelter against the normal legal consequences of his conduct."

certain sentence, or any individual point or instruction, and ignore the others, but you are to consider all the instructions as a whole, and are to regard each in the light of all the others." And in conjunction with the foregoing direction the jury were further correctly instructed (CALJIC No. 72-B) that "In the case of certain crimes it is necessary that, in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed. Thus in the crime of robbery, a necessary element is the existence in the mind of the perpetrator of the specific intent to permanently deprive an owner of his property; and, unless such intent so exists, that crime is not committed."

Thus it appears that upon rather elaborate analysis a correct understanding of the relevant law can be gleaned from the instructions construed as a whole. But trial jurors should not be required to make such an intricate analysis. Assuming materiality, the giving of CALJIC No. 78 in the circumstances of this case could well leave a jury in a state of confusion or even with the impression that as a matter of law a defendant's voluntary intoxication can have no effect on the criminality of his conduct. The subject instruction is intended to be, and should be, used only where the crime charged does not require specific intent. (See *People v. Arriola* (1958) 164 Cal.App.2d 430, 434 [3a] [330 P.2d 683].) As proof of such intent was essential in the case at bench (to support both the robbery count and the count of murder first degree for the purpose of robbery), we hold that it was error to give the challenged instruction. The question to be resolved, therefore, is whether on the record before us the giving of it was prejudicial to defendant. (Cal. Const., art. VI, § 4½.)

No such prejudice appears. As distinguished from the cases relied on by defendant (*People v. Baker* (1954) 42 Cal.2d 550 [268 P.2d 705] ; *People v. Sanchez* (1950) 35 Cal.2d 522 [219 P.2d 9] ; *People v. Garcia* (1959) 169 Cal.App.2d 368 [337 P.2d 100] ; *People v. Coyne* (1949) 92 Cal.App.2d 413 [206 P.2d 1099]), here the evidence of intoxication was minimal and the subject instruction was therefore immaterial. "The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon." (*People v. Miller* (1962) 57 Cal.2d 821, 830-831

88

[11] [22 Cal.Rptr. 465, 372 P.2d 297], and cases there cited.)
 The sole testimony on this point other than defendant's self-serving assertions to the police was the testimony of the officers who arrested defendant shortly after the crimes were committed. It is settled, of course, that nonexpert witnesses may give their opinion as to the intoxication or sobriety of a defendant. (*People* v. *Monteith* (1887) 73 Cal. 7, 9 [14 P. 373]; *People* v. *Wilson* (1958) 160 Cal. App.2d 606, 608 [2] [325 P.2d 106]; *People* v. *Clark* (1951) 106 Cal.App.2d 271, 279 [9] [235 P.2d 56].) Officer Knapp first testified that defendant was "under the influence" of liquor when arrested, but explained as follows:

"Q. [by the deputy district attorney] To what extent, sir? A. Well, his breath was slightly alcoholic. You could tell that he had been drinking, that he had a drink.

"Q. All right.

"Aside from this manifestation, being something that you detected on his breath, was there anything in his appearance, demeanor, or deportment, that led you to believe he was under the influence of intoxicating liquor? A. No; he wasn't, sir."

Officer Stevenson's testimony to the same effect was even more emphatic.[15]

Defendant emphasizes that during the recorded interrogation by Sergeant Meade defendant stated that "I am a little bit more sober than I was three or four hours ago," and that on the day of the shooting he had had "about three shots of whisky" and some beer, and was "pretty well plastered." But it is clear that "Actions of a defendant may completely refute his testimony as to his inability to

---

[15] "Q. [by the deputy district attorney] At the time of your initial contact and later at the station, did you have an opportunity to smell his [i.e., defendant's] breath? A. Yes, I did.

"Q. Did you detect the odor of alcohol on his breath? A. There was a slight odor of alcohol.

"Q. When did you make that observation? At the initial contact or later on? A. During the time of the interrogation at the police station.

"Q. You have been a police officer for some time? A. Yes, I have.

"Q. During the course of time you had occasion to observe people under varying degrees of intoxication? A. Yes, sir.

"Q. From falling down drunk to nothing much wrong with them? A. Yes, sir.

"Q. Based on your contact with this defendant, his movements, his appearance and demeanor, did you form an opinion as to whether he was under the influence of intoxicating liquor? A. Yes, I did.

"Q. State your opinion. A. My opinion was that he was sober.

"Q. Other than this odor of intoxicating liquor which you detected on his breath, was there anything about him which would lead you to the conclusion that he was drinking, sir? A. No, quite to the contrary."

form an intent to do the thing which he did.'' (*People* v. *Arriola* (1958), *supra,* 164 Cal.App.2d 430, 436 [5].) Here defendant entered Heathman's cab with a gun that had been stolen on the previous day; a single shot was fired from the back of the cab, and defendant was seen to leave the rear seat and enter the front; defendant then frisked the body in a search for money or valuables, and Heathman's wallet was subsequently found lying empty on the floor; defendant was seen next to walk a short distance from the cab, then return and remove a bag therefrom, walk rapidly in the other direction, throw the bag into some bushes, and begin to run; after rounding a corner he slowed to a leisurely pace, his jacket over his arm; at no time was he seen to stagger or walk in a manner suggesting intoxication; when arrested only minutes later he denied having been in or near the cab and denied owning the bag thrown in the bushes, and offered his first story (i.e., the ''cut finger'') in explanation of the blood on his hands and clothes; at the police station shortly afterwards he produced his second exculpatory story (i.e., involving ''Ramos'' or ''Reyes'' or ''Rejos''). These are not the actions of a man too drunk to form a specific intent to rob. Here, as in *People* v. *Arriola* (1958), *supra,* 164 Cal.App.2d 430, 437 [3c], ''In view of his acts and the testimony of the other witnesses, it is inconceivable that had the jury been properly instructed on intoxication, the jury could have come to any conclusion other than one of guilt.''

Defendant next contends that the prosecutor committed prejudicial misconduct in his arguments on the guilt phase and the penalty phase. The record does not support this charge. ▮ At the outset it should be noted that no objection was made to any of the statements now assigned as misconduct; in such a case the question on appeal is whether the alleged misconduct contributed to the verdict or otherwise ''was so unredeemable that nothing whatever would have cured it.'' (*People* v. *Rosoto* (1962), *supra,* 58 Cal.2d 304, 357 [52].)

▮ The first two assignments of misconduct relate to the following argument of the prosecutor: after describing professional robbers as ''pretty primitive people by and large, not smart but generally speaking some are aware of the consequences of what they are doing,'' the prosecutor said, ''I suggest to you that a man like Ramos with a record, having known this man [i.e., defendant] in prison, is not going to enlist the aid of somebody who can't do any better than go

to sleep in the cab on the way to a robbery, because this is a man who will be caught, and who can point the unerring finger at him. People in prison have records. People in prison can be found easily.'' No misconduct appears. This argument is directly addressed to the exculpatory story told to the police by defendant following his arrest. As discussed hereinabove, it was not improper to admit into evidence defendant's inconsistent statements concerning his acquaintance with ''Ramos'' in Folsom, as casting serious doubt on the truthfulness of that story; likewise, it was not improper for the prosecutor to subject that story to a close analysis for the benefit of the jury. His argument was speculative; but it ''was not unwarranted by the evidence, and it was for the jury to determine whether it was tenable or untenable.'' (*People* v. *Rosoto* (1962), *supra*, 58 Cal.2d 304, 359 [59].)

The third assignment of misconduct relates to the prosecutor's assertions in rebuttal that ''such avenues of inquiry as were possible'' had been explored by the police, that ''all of the avenues of inquiry were run down,'' and that the People had ''endeavored to put on all of the evidence in this case. . . .'' Defendant attributes sinister significance to these statements ''in the context in which they appear in the record,'' arguing that the prosecutor ''was in effect asking the jury to accept the idea that there was no such person as Ramos.'' A reading of that context,[16] however, discloses that in fact the prosecutor was not discussing the nonexistence of ''Ramos'' but was simply admitting to the jury that the People's scientific evidence had been inconclusive with respect to the ballistics and fingerprint tests of the gun found in the cab. Such a forthright concession was commendable rather than improper.

---

[16]The prosecutor stated: '' 'We produced a good bit of expert testimony, much of which proved to be negligible.

''The prosecution wanted to show this jury that such avenues of inquiry as were possible had been tried by the law enforcement agencies.

'' 'While there would seem to be no question at all that the weapon was used, the ballistics test was made. You heard the result of it.

'' 'We cannot rule out another weapon and you are entitled to know that.

'' 'With reference to the fingerprints, the jury would like to know whether there were fingerprints of this defendant or someone else on the gun.

'' 'All of the evidence in that regard, all of the avenues of inquiry were run down.

'' 'The tests were made and we have the fingerprint of the officer who lost the gun. It doesn't hurt this defendant and it doesn't help him any.

'' 'It is somewhat an unusual circumstance and you are entitled to know about it.''

The final assignment of misconduct refers to the prosecutor's argument on the penalty phase that "whatever rehabilitative processes are available in our State Prisons, whatever therapeutic effect such custody may be presumed to have upon those who suffer it, it hasn't had any here." Defendant asserts that there is no evidence in the record to show a failure of rehabilitation as to him, and argues that this and certain other statements of the prosecutor were "calculated to inflame and arouse the passions of the jury." The record again refutes this contention. Defendant had not only been previously convicted of a felony (theft of an automobile), but while on parole under that conviction had committed burglary, then had escaped from custody under the burglary conviction and had committed a second automobile theft. Nor were inflammatory remarks of any kind made by the prosecutor; indeed, his entire argument on the penalty phase was temperate and restrained.

Defendant contends that he was denied a fair trial because the deputy public defender represented him in an assertedly "casual and perfunctory manner." In particular, defendant complains that his counsel did not make certain discovery motions, did not object to the hereinabove discussed remarks of the prosecutor on *voir dire* and in summation, did not "insist that an adequate foundation be laid" for the reception of the tape recording, and did not sufficiently press his cross-examination or make sufficiently vigorous closing arguments. A reading of the record demonstrates that these complaints are unwarranted. In some of the instances cited by defendant the conduct complained of was well within the discretion of counsel trying the case; while in the remainder there was simply no error to which counsel could properly have objected. The People's evidence showed an unprovoked killing committed for robbery in the presence of eyewitnesses who saw substantially all except defendant's finger on the trigger and the few blood-stained dollars obtained. In the circumstances the deputy public defender, saddled with defendant's inconsistent and obviously fabricated stories to the police, was in an unenviable position. Nevertheless he undertook an active defense and cross-examined particularly on the crucial issue of identification, exploiting such discrepancies as occurred in that testimony. While defendant's counsel on appeal may feel that they would have tried the case in a different manner, the deputy public defender's conduct of the defense is not properly subject to the criticism now levelled

at it. Defendant was adequately represented, fairly tried, and justly convicted.

Finally, defendant contends that the trial court failed to rule on his motion for reduction of the penalty to life imprisonment. The record shows, however, that this motion was not separately made but was incorporated in defendant's motion for a new trial (pursuant to Pen. Code, § 1181, subd. 7) ; the latter motion was heard, ruled upon and denied in its entirety, and the judgment correctly recites this fact.

The judgments are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., Tobriner, J., and Peek, J. concurred.

Appellant's petition for a rehearing was denied July 31, 1963.