[Crim. No. 18957. First Dist., Div. One. Apr. 15, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
GORDON KENNETH PAGE et al., Defendants and Appellants.

**COUNSEL**

Steven J. Alpers and Quin Denvir, State Public Defender, under appointment's by the Court of Appeal, and Carol Jean Ryan, Deputy State Public Defender, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Ann K. Jensen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GRODIN, J.**—On May 6, 1978, Katherine R. was in a motel room with two men, Gordon Page and Richard Appleby. They were angry with her for something she had done. According to prosecution evidence, the following events occurred. Page and Appleby told her she needed a lesson, that they would tattoo her. Appleby tore her top off, they put her on a bed, and Appleby held her down while Page tattooed her with a tattooing needle. When Ms. R. pleaded with them to stop, Appleby struck her in the face with a closed hand about four times, and Page slapped her once. Page tattooed the letters "M.F.F.M." (representing a club slogan, Misfits Forever, Forever Misfits) over an area measuring four by two and one-half inches on her left breast. He then tattooed "Property of G. P." (Gordon Page) over an area one inch by eight to ten inches on her abdomen, and Appleby tattooed the words "Mine Too," with an arrow, on her left thigh. While she was being tattooed by Page, Appleby held a belt across her neck, and on one occasion hit her across the back with it. Then Appleby ordered her to remove her wedding rings, upon threat of cutting off her fingers to get them, and Ms. R. complied. Appleby took her purse from her, and when she got it back later it was missing the money ($200) which had been inside. After some further harassment, Ms. R. was allowed to leave.

Page and Appleby were both charged initially with false imprisonment (Pen. Code, §§ 236-237), battery with serious bodily injury (Pen. Code, §§ 242-243), robbery (Pen. Code, § 211), and mayhem (Pen. Code, § 203). Following trial before a jury, the court granted Page's motion for acquittal on the robbery count, and granted the prosecution's motion to dismiss the battery count as to both defendants. The jury found Page guilty of false imprisonment and mayhem, and it found Appleby guilty of false imprisonment, robbery, and mayhem. Both defendants appeal from the ensuing judgment. Page raises questions of prosecutorial misconduct, Appleby raises questions of instructional error as to his robbery conviction, and both raise questions relating to their convictions for mayhem. We will consider their contentions in that order.

1. Did the prosecutor engage in misconduct when he asked the court to allow a witness to give the district attorney's address as his own?

■ The prosecution called as an expert witness Dr. Lucid, a plastic surgeon. When the clerk asked him his address the prosecutor interrupted and asked if the witness could give the office of the district attorney as his business address, and the court granted permission to do so. Page argues that this may have led the jury to conclude that the witness had been threatened by someone connected with the case, and to be prejudiced on that account against him.

Shortly after the prosecution began its examination of Dr. Lucid, defense counsel approached the bench and voiced objection. The court declared a recess and counsel, together with Dr. Lucid, went into the court's chambers. There the prosecutor stated that his reason for the request he made regarding Dr. Lucid's address was that Dr. Lucid had expressed concern about possible retaliation. Dr. Lucid stated that he had not received any threats, but that his apprehension was based on a "gut reaction" to the kind of people who would do this type of thing to a person. The court denied defense counsel's motion for a mistrial, but directed that when Dr. Lucid resumed the stand he should give his correct business address, and he did.

Defense counsel did not ask that the jury be admonished regarding this matter. It has been held that an alleged act of prosecutorial misconduct cannot be reviewed on appeal in the absence of a request for admonishment, unless (a) the case is closely balanced, there is doubt of defendant's guilt, and the act of misconduct contributed materially to the verdict, or (b) the act done was of such a harmful nature that it could not be cured by an admonishment. (*People* v. *Lambert* (1975) 52 Cal.App.3d 905, 908 [125 Cal.Rptr. 404].) We do not regard either exception as applicable to this case. The evidence against both defendants was quite substantial; and assuming arguendo that the prosecutor's request constituted misconduct despite his apparent good faith belief that the witness felt threatened, the effect of that prejudice under the circumstances was not likely to be substantial. Indeed, whatever effect that conduct may have had was likely to have been rendered de minimis when the jury saw Dr. Lucid resume the stand after conference with the court and attorneys and provide his business address. In all probability, that state of affairs was more advantageous to the defendants than an admonishment would have been; but we cannot say that an admonishment would not have been effective.

2. Did the prosecutor engage in misconduct by eliciting testimony concerning prior misconduct of Page?

In cross-examining Ms. R., Page's counsel asked whether she had said something to Page before he slapped her. She replied, "something that I knew he had done to a previous girl and I told him that he was treating me just like her, and he slapped me and told me to shut up." This response led to further probing and evidence from both sides. On redirect, the prosecutor elicited from Ms. R. the information that what she had said to Page was, "You are treating me just like Kathy," that Kathy was someone Page had been living with in Santa Rosa, and that when Ms. R. last saw Kathy "she had a big scar on her face." On re-cross, Page's counsel elicited the further information that Page told Ms. R. that he had thrown a knife at Kathy, and hit her in the face, because he was angry with her. Page then called Kathy as a witness, and she testified that Page had never hurt her and that the scar was caused by an auto accident. On cross-examination Kathy was asked if she had suffered any other unusual facial disorders, and she replied in the negative. The prosecutor showed her a photograph taken on April 2, 1978 (while she was living with Page) in which she appeared with two black eyes, and asked if she had told a police officer that she received the black eyes when she was helping a paraplegic at work and fell down the stairs. Kathy replied that she may have said that, but admitted that was not how she got the black eyes. The prosecutor then called as a rebuttal witness a police officer who testified that on March 31, 1978, he went to a house in Saratoga and saw Kathy there, that she had acute swelling and dried blood on the left side of her face and in the area of her nose, and that upon inquiry from the officer as to how she received those injuries she replied in a sarcastic tone that she had fallen down the stairs.

■ Page's appellate counsel argues that the prosecutor was guilty of "misconduct" by eliciting this testimony, and in the alternative that Page was denied a fair trial because his counsel failed to object. We find both arguments to be without merit. Page's trial counsel opened the door to the testimony by his question to Ms. R. on cross-examination. It was hardly "misconduct" for the prosecutor to seek clarification of the response through further questioning. Ms. R., after all, was a prosecution witness and it was upon her credibility that the prosecution's case rested. It is possible that an objection by trial counsel at that

point would have been successful (Evid. Code, § 352), but "[t]he choice of when to object and when to allow the evidence to come in as offered is inherently a matter of trial tactics. Ordinarily the tactical decisions of trial counsel will not be reviewed with the hindsight of an appellate court." (*People v. Perry* (1969) 271 Cal.App.2d 84, 114-115 [76 Cal. Rptr. 725].) Trial counsel may have considered that he had ample ammunition in testimony from Kathy to rebut any inference of prior misconduct. That tactic viewed in hindsight appears to have backfired, but we cannot say that it reflected incompetence of counsel. Once Kathy was called as a witness, of course, the door was wide open and what followed was fair game.

3. Did the trial court have a duty to instruct *sua sponte* that voluntary intoxication could negate the specific intent required for the crime of robbery?

■ There was evidence that both appellants shared some rum and smoked some marijuana in the motel room prior to their alleged criminal conduct. With respect to an allegation that Appleby inflicted great bodily injury upon Ms. R. in connection with the false imprisonment count, the trial court did instruct the jury in accordance with CALJIC No. 4.21 that it could consider whether Appleby's intoxication prevented him from forming the intent to inflict great bodily injury. The court also instructed the jury in accordance with CALJIC No. 4.20 that it should not consider Appleby's intoxication with regard to the charge of false imprisonment or mayhem, since neither of these crimes requires specific intent. The court gave no instruction on the effect of intoxication, however, with respect to the robbery charge. Appleby argues that under the circumstances he was entitled to such an instruction, and we agree. While it is debatable whether the evidence of intoxication in this case was sufficient to require a *sua sponte* instruction on the defense of voluntary intoxication at all (cf. *People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913]) the court obviously deemed it sufficient to warrant such an instruction with respect to the great bodily injury charge. The crime of robbery requires a specific intent to permanently deprive the owner of the property. (*People v. Crawford* (1968) 259 Cal.App.2d 874, 877 [66 Cal.Rptr. 527].) If the jury believed appellant was too intoxicated to form the requisite intent, it would be required to acquit him of that charge (*People v. Fanning* (1968) 265 Cal.App.2d 729, 733 [71 Cal.Rptr. 641]). The failure to in-

struct the jury with respect to the effect of intoxication as a defense to that charge could well leave a jury in confusion on that issue. (Cf. *People* v. *Spencer* (1963) 60 Cal.2d 64, 87 [31 Cal.Rptr. 782, 383 P.2d 134].)

It seems likely that the basis for the jury's finding that Appleby was guilty of false imprisonment but *not* of inflicting great bodily injury was, precisely, the intoxication defense. It therefore seems likely that if the jury had been properly instructed with respect to the effect of intoxication upon the robbery charge it would have reached a different result. Appleby's conviction for robbery, therefore, cannot stand.

4. Were appellants properly convicted of the crime of mayhem?

Penal Code section 203 provides that "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

Appellant Page argues that neither the statutory language nor decisions under the statute provide sufficient notice that the tattooing of a person may constitute mayhem, and that his conviction represents an unforseeable and retroactive application of the statute which deprives him of due process of law. (Cf. *Keeler* v. *Superior Court* (1970) 2 Cal. 3d 619, 634-635 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) Recognizing that this court in *Goodman* v. *Superior Court* (1978) 84 Cal.App.3d 621 [148 Cal.Rptr. 799], held that the infliction of a five-inch scar on the victim's face could constitute the crime of mayhem, Page argues that the act of tattooing is "qualitatively different from cutting a person's face with a knife" because in the latter case there is no doubt that the act is aimed at injury, whereas many persons have themselves tattooed voluntarily. That argument in the context of this case is equivalent to saying that a defendant who cuts off a person's leg against his will is not guilty of mayhem because some people voluntarily have their legs amputated for medical reasons. Page attempted to convince the jury that Ms. R. consented to the tattooing; the court instructed the jury that consent would be a defense; the jury presumably found contrary to Page's contention, and its finding is amply supported by the evidence.

Appellant Appleby tries a different approach. He argues that tattooing of a woman's abdomen or breast cannot be mayhem because the torso is not a "member" of the body within the meaning of section 203. We find the argument ingenious but not persuasive. The term "member" is variously defined as "A part or organ of the animal body, especially a limb" (Funk & Wagnalls Standard College Dict. (1974)); as a "general term applied to any integral part or vital organ of an organized animal body, or, more widely, to any integral or distinguishable constituent part of a whole which is considered as organic..." (The Random House Dict. of the English Language (1966)); and as "a bodily part or organ...*specif*: a part (as a limb) that projects from the main mass of the body" (Webster's Third New Internat. Dict. (1965)). In *Goodman*, the human head was found to be a "member," and in *People* v. *Cartier* (1960) 54 Cal.2d 300, 311 [5 Cal.Rptr. 573, 353 P.2d 53], severing a woman's vagina and the external genitalia from her body and cutting out her heart were characterized as mayhem. While there may be some room for argument about an abdomen, the female breast clearly qualifies as a "member" of the body by any dictionary, common, or legal definition of the term.

Appleby also argues that the jury was improperly instructed on the meaning of the statutory term "disfigurement." The trial court defined that term for the jury as follows: "that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner." Appleby contends this definition is incorrect because it fails to incorporate the concept that the injury must be "permanent." (*Goodman* v. *Superior Court, supra*, 84 Cal.App.3d 621, 624.) We are cited to nothing in the record which indicates that either defendant objected to the proposed definition or that either defendant proposed a different definition. ■ "The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction [citation], and is ordinarily sufficient when the defendant fails to request further amplification. [Citations.] If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language. [Citation.]" (*People* v. *Jones* (1971) 19 Cal.App.3d 437, 447 [96 Cal.Rptr. 795].) ■ The prosecution's witness, Dr. Lucid, testified that he examined the victim and found the tattoos on her breast and abdomen were permanent because the pigmentation had entered the dermis layer of the skin. He testified that if the area of a tattoo is narrow enough it can be stitched together

by a suture, but if the area is wide it can only be "removed" by a skin graft, and both procedures leave permanent scarring for life. The defendants made no attempt to counter this evidence. Thus, the only evidence the jury had before it was evidence showing that at best Ms. R. would have to endure permanent scarring on her breast and abdomen for the balance of her life. The law of mayhem as it has developed protects the integrity of the victim's person. (*People* v. *Green* (1976) 59 Cal.App.3d 1, 3 [130 Cal.Rptr. 318].) Whether or not it would be a defense to the crime of mayhem that an injury is totally remediable by modern techniques of plastic surgery (cf. *Lamb* v. *Cree* (1970) 86 Nev. 179 [466 P.2d 660, 663]; *Goodman* v. *Superior Court, supra,* 84 Cal.App.3d at p. 625), an injury which leaves permanent scarring of that sort is clearly "disfigurement" within the meaning of the statute (*Goodman, supra; United States* v. *Cook* (D.C. Cir. 1972) 462 F.2d 301, 304), and the jury could hardly have reached any different conclusion. If there was any error in the trial court's failure to provide more specific instructions *sua sponte*, it was not error likely to have affected the outcome of the case. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

Appleby's judgment of conviction for robbery is reversed, and both judgments of conviction are otherwise affirmed. Appleby contends that pursuant to Penal Code sections 4019 and 2900.5 he is entitled to 75 days' presentence credit for good time/work time spent in county jail. The legal issue presented by that contention has recently been decided in Appleby's favor by the Supreme Court in *People* v. *Sage* (1980) 26 Cal.3d 498 [162 Cal.Rptr. 450, 606 P.2d 757]. The matter is remanded to the trial court for determination, in accordance with that opinion, of the conduct credit to which Appleby is entitled.

Elkington, Acting P. J., and Newsom, J., concurred.

A petition for a rehearing was denied May 14, 1980, and the petition of appellant Page for a hearing by the Supreme Court was denied June 12, 1980.