[Crim. No. 11867. Second Dist., Div. One. Mar. 10, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WAYNE JAY DEATHERAGE, Defendant and Appellant.

Philip C. Greenwald, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard D. Huffman, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was charged with robbery (Pen. Code, § 211) and that at the time of its commission, and his arrest he was armed with a deadly weapon; and a prior felony conviction (later stricken on motion of the People). He entered pleas of not guilty and not guilty by reason of insanity; experts were appointed to examine him regarding his present sanity and sanity at the time of the commission of the offense. The case proceeded to a jury trial; during its course the charge against codefendant O'Brien was dismissed on the People's motion. Defendant was found guilty as charged and that he was armed at the time of the commission of the robbery, and his arrest. Another codefendant, Patricia Bledsoe, was acquitted. Defendant personally and all counsel waived trial by jury on the issue of his sanity and stipulated that the matter be submitted on the file, doctor's reports and evidence heard at the trial. The judge found defendant to be sane at the time of the trial and at the time of the commission of the offense. Defendant was sentenced to the state prison; he appeals from the judgment.

On September 3, 1965, around 4:30 p.m., Joan Kelly, a cashier at J. W. Robinson store, was walking from the third

to the second floor carrying in a shoe box approximately $1,300 in currency packaged in bundles of $100 in denominations of $5, $10 and $20; the money was new which was largely in order by serial number. Another employee, Mr. Sakamoto, accompanied her. Just before they reached the second floor Joan was grabbed from behind by defendant, known to her at the time as Wayne Travis. He was wearing sun glasses and had a gun pointed at her. Joan recalled falling to the floor and observing defendant pick the money off the stairs with his left hand and place it in his left pocket. She did not recall any alcohol on his breath. Sakamoto also saw defendant point a gun at them, pick up the money that had fallen from the shoe box, place it in his pocket and proceed down the stairway toward the first floor.

Defendant, known to Shirley Wickland, a security officer for the store, as Travis, came to the personnel office to pick up his paycheck; he was unable to obtain it at that time and stayed around in the office area for 5 or 10 minutes. She described a driveway along the west side of the store adjacent to the employees' entrance. Around 5 p.m. Robert Naumann, a security guard, observed defendant, whom he knew as Wayne Travis, on the first floor employees' stairwell; defendant came down the stairs wearing dark glasses. Naumann noticed a stack of bills in his coat pocket. As defendant reached Naumann, defendant turned and pointed a gun at him and proceeded to search him; defendant then left starting down the stairs toward the basement where he turned and went out of the employees' entrance walking at a fast rate. Stationed at the employees' desk near the employees' entrance checking people in and out through the exit was Phyllis Jossman. She saw defendant leave through the exit around 5 p.m. Before that she had been outside where she informed a woman, identified as codefendant Bledsoe, that she would have to move her car (a 1956 Buick) which was double-parked in the driveway.

Around 9:30 p.m. defendant was arrested in an apartment in Hollywood; he was in the company of codefendants Bledsoe and O'Brien. When the police entered they observed a gun containing four rounds of live ammunition in defendant's hand; there were additional rounds on the dresser. They found $1,194 in new currency on the dresser, and removed $41 from a purse on the sofa bed and $43 from codefendant O'Brien. Defendant's car, a 1956 Buick (identified in a photograph contained in People's Exhibit 5 as the one in which

codefendant Bledsoe was parked in the employees' entrance) was found near Pico and Doheny; upon searching the car officers found a group of 10 rubber bands on the floor near the passenger's side.

Codefendant Patricia Bledsoe testified that defendant asked her to drive him to J. W. Robinson to pick up his check; they took a cab to where defendant's car was located then she drove him to the store; upon arriving she parked in the driveway near the employees' entrance; some time later defendant came out, got into the car and told her to "take off"; he had a gun with him at the time and a large amount of cash in his possession. Two weeks prior to this she observed defendant drink alcoholic beverages, usually Scotch. When asked if defendant was intoxicated when they went to Robinson's she answered, "I suppose he had had a few." She was asked a number of times whether he was intoxicated at the time and each time she parried the question and evaded answering it. Finally, when asked by the court if he was under the influence of intoxicating liquors, she said, "He had been drinking some," but "he didn't act intoxicated."

Defendant testified that he went to J. W. Robinson where he had been previously employed; he had been off work for some time because of alcoholic hangovers and "D.T.'s"; on September 3 he had been drinking Scotch; he carried a gun with him because his life had been threatened by someone; he took a cab to where his car was picked up because a friend had previously borrowed it and he had just found out where it was; he felt unable to drive because of his drinking; on arriving at the store he went to the personnel department but was unable to obtain his paycheck; he left the office and went to the cafeteria in search of the shoe department manager; his memory was hazy about what occurred thereafter but he recalls that he grabbed the box from Miss Kelly while on the stairway and that it fell to the floor whereupon he picked up the money and put it in his pocket; he did not have the gun drawn at the time but the gun fell from his belt to the floor and he picked it up and held it in his hand; then he ran downstairs where he met the guard, at which time he had his gun down at his side; when he left that area he became confused and started for the basement, thereafter leaving the store and reaching the car where codefendant Bledsoe was waiting, and instructed her to drive off.

In rebuttal, O'Brien, after the charges against him were dismissed, testified that he met Patricia Bledsoe and defend-

ant on September 3 at the apartment in Hollywood around 8 or 9 p.m.; he had gone there to borrow money and saw Bledsoe give defendant $40 which defendant gave to him; on cross-examination he testified that defendant was pretty well intoxicated at the time of arrest.

The first point raised by appellant is that the trial court committed prejudicial error in failing to properly endorse his Special Instruction No. 5 (on voluntary intoxication when relevant to specific intent). He argues that from this failure it must be assumed that the instruction was not given and the jury was not instructed on his defense of intoxication.

While the reporter's transcript does not contain the instructions read by the judge, the clerk's transcript reveals a folder prepared by the clerk of the superior court containing 38 pages of ''Instructions Given'' to the jury; included therein is defendant's Special Instruction No. 5 which is stamped but does not bear the endorsement of the court. Section 1127, Penal Code, requires that ''. . . Upon each charge presented and given or refused, the court must endorse and sign its decision and a statement showing which party requested it. . . .''; and section 1176, Penal Code, provides that ''the judge must make and sign an indorsement upon such instructions, showing the action of the court thereon.'' It is apparent that as to Special Instruction No. 5 the strict technical requirements of these sections requiring the court to indicate which instructions were given and which were refused by endorsing its decision thereon, have not been met. Faced with a similar noncompliance with section 1127, the court in *People* v. *Lazard,* 229 Cal.App.2d 347 [40 Cal.Rptr. 358], stated the general rule to the effect ''that if an instruction is unmarked, it must be deemed to have been refused. [Citations.]'' (p. 349), but considered the augmented record on appeal which included the jury instructions as packaged by the clerk of the court and statements in the reporter's transcript and clerk's transcript, each to the effect that the jury was instructed, and concluded that the instructions had in fact been read to the jury, and affirmed the judgment. Likewise in *People* v. *Bush,* 227 Cal.App.2d 795 [39 Cal.Rptr. 17], there was a noncompliance with section 1176—''a technical error on the part of the judge,'' but the court held that ''the agumented record clearly reflects all of the instructions offered by both sides, and also which instructions were given and which were refused'' (pp. 797-798), and found that there was no reversible error.

In the case at bar the clerk's transcript includes the folder of "Instructions Given" including Special Instruction No. 5, which appears to be the only instruction not endorsed by the judge. However, the record on appeal has been augmented by the People to include the declaration of the trial judge that all of the instructions in the group marked "given" were read by him to the jury, and the declaration of his clerk that he handed to the judge in a folder marked instructions "given" all instructions to be read, including defendant's Special Instruction No. 5. Thus, the record before us shows that the instructions read to the jury were assembled separately in a folder marked "given" with the number of pages recorded thereon, defendant's Special Instruction No. 5 was contained in the packet and that all instructions therein were in fact read by the judge to the jury.

The defendant's Special Instruction No. 5 relates to the effect of voluntary intoxication on the ability to form the necessary specific intent. It is an exact copy of form 78-B, CALJIC, with adaptations. The instruction is a correct statement of the law and here was properly given in a case requiring specific intent and in which was raised the defense of intoxication. (*People* v. *Gorshen,* 51 Cal.2d 716, 733 [336 P.2d 492]; *People* v. *Garcia,* 169 Cal.App.2d 368, 371 [337 P.2d 100].) In addition, defendant also prepared and requested Special Instruction No. 6 (as modified by the trial court). It is an exact copy of CALJIC No. 78-A, which deals generally with the effect of voluntary intoxication as a defense. Undoubtedly it was error for the court to give this instruction in a case involving specific intent. In the crime of robbery a necessary criminal element is the existence in the mind of the perpetrator of the specific intent to permanently deprive an owner of his property, and unless such intent exists that crime is not committed. Special Instruction No. 6 is intended to be and should be used only where the crime charged does not require specific intent. (*People* v. *Arriola,* 164 Cal.App.2d 430, 434 [330 P.2d 683].) Inasmuch as proof of specific intent here was essential to support the robbery charge, we conclude that it was error to give the challenged instruction. (*People* v. *Spencer,* 60 Cal.2d 64, 87 [31 Cal.Rptr. 782, 383 P.2d 134].) The question to be resolved, therefore, is whether on the record before us the giving of Special Instruction No. 6 was prejudicial to the defendant. (Cal. Const., art. VI, § 4½.*)

*Reporter's Note: Now art. VI, § 13. See constitutional revision adopted November 8, 1966.

No such prejudice appears. As distinguished from the cases relied on by appellant, *People* v. *Garcia,* 169 Cal.App.2d 368 [337 P.2d 100], and *People* v. *Coyne,* 92 Cal.App.2d 413 [206 P.2d 1099], here the evidence of intoxication was minimal and the challenged instruction was, therefore, immaterial. The defendant testified that he had been drinking off and on for some years and that on "this particular day I had been drinking"; he also testified that he asked codefendant Bledsoe to drive his car to Robinson's "primarily because I didn't have a driver's license, and I was pretty well under the influence of liquor." Further, it appears that after the robbery, defendant drank up to the time of his arrest that evening, but there is no testimony that defendant was intoxicated at the time of the robbery. Further, his testimony concerning what occurred in the store and his state of mind at the time, does not relate to intoxication but only to his aggravation and nervousness over his failure to obtain his paycheck on that day and his anxiety over obligations and being pressed for money. His testimony does not reflect that he was under the influence of intoxicating liquor at the time he robbed Joan Kelly. None of the other witnesses who saw defendant, not even his codefendant Patricia Bledsoe, corroborated his testimony that he was intoxicated *prior* to the robbery. Miss Bledsoe said that he had had "a few" before he went into the store but that she did not believe "he acted intoxicated." The bulk of the testimony relative to intoxication deals with the defendant's condition at the time he was arrested. ■ "The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon." (*People* v. *Miller,* 57 Cal.2d 821, 830-831 [22 Cal.Rptr. 465, 372 P.2d 297].) ■ The evidence of defendant's intoxication at the time of the robbery is very slight; the most defendant's testimony shows is that he was highly nervous because of previous drinking bouts and aggravated because he was hard pressed for money and failed to obtain his paycheck. Defendant denied that he entered the store with the intent to rob, but his own testimony shows that after he failed to obtain his paycheck he conceived the plan to take the money away from Joan Kelly. His actions were not those of an intoxicated man; in fact, he did not testify he was intoxicated when he robbed Joan. Interestingly enough, there is nothing in his testimony wherein he claimed that he was unable to form an intent to do the thing which he did. As in

*People* v. *Arriola,* 164 Cal.App.2d 430, 436-437 [330 P.2d 683], "In view of his acts and the testimony of the other witnesses, it is inconceivable that had the jury been properly instructed on intoxication, the jury could have come to any conclusion other than one of guilt." (*People* v. *Spencer,* 60 Cal.2d 64, 89 [31 Cal.Rptr. 782, 383 P.2d 134].) We find no prejudice from the giving of defendant's requested Special Instruction No. 6. Further, in the light of the entire record we cannot consider the technical noncompliance with section 1176, Penal Code, to be reversible error under article VI, section 4½, of the California Constitution.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 4, 1967.