[Crim. No. 6056. First Dist., Div. One. July 9, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES E.
GRAVES, Defendant and Appellant.

Charles E. Graves, in pro per., and Jay R. Mayhall, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Jerome C. Utz, George R. Nock, John T. Murphy and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, P. J.—Defendant appeals from a judgment of conviction stemming from jury verdicts finding him guilty as charged of a violation of Health and Safety Code section 11530 (unlawful possession of marijuana) and five counts of first degree robbery.

Defendant contends as follows: first, that the trial court committed reversible error in giving an instruction stating that drunkenness is not a defense per se (CALJIC No. 78), in conjunction with an instruction relating to intoxication as negating specific intent (CALJIC No. 78-B); second, that marijuana cigarettes were illegally seized in a search of defendant's person and should not have been admitted in evidence; third, that prejudicial misconduct of the prosecutor and certain actions of the court concurred to deny defendant a fair trial; fourth, that defendant's conviction of robbery under count four is posited on physically impossible evidence; fifth, that the lineup procedure in this case was unfair because the participants were too much alike.

## *Facts*

Defendant was convicted of five separate robberies of service stations in 1966 occurring on Friday, February 4, Sunday, February 6, and Monday, February 7, on which last date three of the alleged robberies took place. The *modus operandi* of the five robberies was similar; in each case, the robber, an adult male Negro, approached a service station operator who was busy near a cash box or cash register, brandished a small caliber dark blue or black revolver, and demanded cash. In two of the robberies, the robber told his victim not to be a hero. Four of the robberies occurred in the East Oakland area and one occurred in Alameda.

The testimony of the five victims, reported here in the chronological order in which the robberies occurred, may be summarized as follows: around 6:45 p.m. the night of February 4 (Friday) Collins was in a "dog house" where cash was kept at a Regal Gas station in Alameda when a person, whom Collins identified at the trial as defendant, appeared, wearing dirty white pants and a tan trench coat and hat and brandishing a bluish revolver, and demanded money. Collins put the change in a paper sack; a customer came in, and defendant said "to play it cool and just like nothing was happening." After taking the money defendant said, "I'm going to leave, so turn around and face the glass. Don't nobody turn around or somebody will get shot. Maybe not you, but somebody. Don't try to be a hero."

Around 6:40 p.m. on Sunday, February 6, Luckey was counting money in the cash house of a Simas Brothers filling station at 4200 MacArthur Boulevard in Oakland when a person whom he identified at the trial as defendant approached, carrying a small caliber black or dark blue revolver, and said "Move slow and nobody will get hurt." Defendant was wearing a black nylon ski jacket with a hood in the collar. Defendant took all the money and left.

At 6:30 p.m. the evening of February 7 (Monday) a person, identified by Dewey at the trial as defendant, approached Dewey, an attendant at a Chevron station located at 1451 Liemert Boulevard in Oakland, pulled a small caliber blue or black gun and said, "Give me your money and don't be a hero." Defendant was wearing a dark blue or black nylon ski jacket with hood. As instructed by defendant, Dewey put the money in a change bag and gave it to defendant. A customer arrived and defendant told Dewey to "Go take care of the customer and don't be a hero."

A Mr. Elseth, who lived one block from the Chevron station, at around 6:30 p.m. the evening of February 7 (Monday) saw a 1954 green Studebaker parked in front of his house with its lights off and its engine running; the window in front opposite the driver's side was cracked. He saw a Negro leave the car, go toward the gas station, then run back to the car and drive away. Later, at 6:50 p.m., in the vicinity of 2d Avenue and East 14th Street in Oakland, Elseth saw that same vehicle parked with a Negro in the passenger seat. He took the license number, went to the Chevron station and gave it to the police officer whom he found there. Elseth could not identify the driver of the vehicle but testified that he wore a dark blue or black loose jacket. In court Elseth identified the Studebaker from photographs offered in evidence by the People of a 1954 Studebaker belonging to defendant.

The fourth robbery occurred at approximately 7 o'clock that same Monday evening. McKenna was making change for himself at a Douglas Oil Company gas station at 2662 Fruitvale Avenue in Oakland when a person he identified at the trial as defendant approached, wearing a dark blue or black hooded ski jacket and carrying a dark blue revolver, and asked for money. The station manager then came out to the cash box and defendant, after taking some cash and stuffing it in his pocket, told the station manager and McKenna to go into the office and open the safe; however, a customer drove up and defendant told his victims to forget about the safe and to wait on the customers. McKenna testified that defendant had glassy eyes, slumped, and walked slowly, and that he had a mustache.

The final robbery took place that Monday evening at 10:15 at a Douglas Oil Company station at 2200 East 12th Street in Oakland. Cordova was counting money when a person, whom he identified at the trial as defendant, appeared carrying a black pistol with white handles and demanded money. At defendant's direction Cordova put the money in a red rag on the counter, opened the till and went into the back room, whereupon defendant left. Cordova testified that defendant was wearing a hat, khaki clothes, and a pullover sweater, that he had no mustache, that he walked with a slouch and dragged his feet, and that he didn't look sober and had alcohol on his breath, and staggered once or twice.

The circumstances surrounding defendant's arrest and the seizure of the marijuana are as follows: late Monday night, February 7, at approximately 11 to 11:15 p.m., Officer Garri-

son of the Oakland Police Department, prior to his going out on his beat, received information from the police lieutenant in charge at the lineup training (at which other police officers were present) that defendant was a possible suspect in the foregoing robberies. At that time Garrison and the other officers in the lineup training received a description of the 1954 green Studebaker, were advised that it was owned by defendant, and were given his residence address. At that time Garrison was also informed that there were outstanding traffic warrants for defendant's arrest. Garrison knew that an arrest warrant for defendant was on file for traffic offenses but he did not have this warrant in his possession when he went out on patrol.

Around 1 a.m. on Tuesday, February 8, Garrison stationed himself near defendant's residence at 550 Colorados Street. Defendant's car approached, which the officer recognized, and the officer followed the vehicle for a block and a half to two and a half blocks and observed that the car was swerving across the double line and traveling very slowly. After defendant stopped, the officer approached the car, recognized defendant, asked him to get out of the vehicle at gun point, and placed defendant under arrest pursuant to the arrest warrant for traffic offenses. Defendant's eyes were glassy, he said nothing and got out slowly. After arresting and handcuffing defendant, Garrison gave him a thorough search, going through his pockets checking for weapons and removing change and other personal items. Although no weapons were found, the officer discovered a packet of 10 marijuana cigarettes. The officer could not remember on the stand whether defendant had appeared to be drunk or smelled of alcohol at the time of arrest. The marijuana cigarettes were admitted into evidence over the objection that there was no reasonable and probable cause to arrest defendant or make a search.

Numerous defense witnesses testified that defendant had spent the weekend with them on a drinking orgy; the gist of their testimony, if believed, would establish that defendant was drinking heavily and was in a state of intoxication from the afternoon of Friday, February 4 through at least midnight on Monday, February 7, and that he was at various wild parties and nightclubs Saturday, Sunday and Monday nights. Defendant's sole defense to the charges of robbery was alibi, i.e., that he had been on a "lost weekend" and had not committed the robberies in question. Thus in his argument to the jury, defense counsel did not argue the defense of

diminished capacity, but did argue that defendant had been drunk all weekend and that a man as drunk as defendant was could not have had the capacity to go into a service station and cold-bloodedly demand money at gunpoint.

Following his arrest defendant was placed in a lineup which was held on Tuesday, February 8. All the robbery victims were present to view it. They were told not to talk but to write down the number of anyone they recognized. All identified defendant, who had a mustache and was the man in the middle. The lineup included only Negroes with some facial hair and all participants were of roughly similar height and build. There is no contention here that any procedural irregularities occurred in the manner of handling the lineup, nor does the record give any evidence of such.

## Instructions on Intoxication

■ The trial court gave instructions substantially in the form of CALJIC No. 78,[1] a general instruction on the effect of voluntary intoxication as a defense to a crime, and CALJIC No. 78-B[2] to the effect that in the crime of possession of narcotics knowledge is an essential element of the crime, that in the crime of robbery the specific intent to feloniously take the property of another is an element of the crime, and that in ascertaining whether defendant had such knowledge or spe-

[1]CALJIC No. 78, with adaptations, reads as follows: ''Our law provides that 'no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent, or the existence of knowledge, is a necessary element to constitute any particular crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, intent or knowledge with which he committed the act.'

''This means that drunkenness, if the evidence shows that the defendant was in such a condition when allegedly he committed the crimes charged, is not of itself a defense in this case. It may throw light on the occurrence and aid you in determining what took place, but when a person in a state of intoxication, voluntarily produced by himself, commits a crime such as those charged against the defendant in this case, the law does not permit him to use his own vice as a shelter against the normal legal consequences of his conduct.''

[2]CALJIC No. 78-B, with adaptations, reads as follows: ''In the crime of possession of narcotics, as I have previously told you, knowledge is an essential element of the crime. And in the crime of robbery, the intent to feloniously take the personal property of another is a specific and necessary element of the crime. This fact requires an inquiry into the state of mind under which the defendant committed the acts charged, if he did commit them. In pursuing that inquiry, it is proper to consider whether he was intoxicated at the time of the alleged offense. The weight to be given the evidence on that question and the significance to attach to it, in relation to all the other evidence, are exclusively within your province.''

cific intent the jurors were to consider whether he was intoxicated at the time of the alleged offense and the effect of such intoxication on his state of mind. Defendant contends, essentially that CALJIC No. 78 states that voluntary intoxication is not a defense to a crime, and that, therefore, it was error to give his instruction since the crimes charged in the present case were specific intent crimes to which voluntary intoxication may be a defense.

It should be here noted that although CALJIC No. 78 is a general instruction on intoxication and does state that generally voluntary intoxication is not a defense to a crime, it includes a statement that where the existence of intent is a necessary element of the crime, the jury in determining the intent with which a defendant acted " 'may take into consideration the fact that the accused was intoxicated at the time, . . .' " In *People* v. *Arriola* (1958) 164 Cal.App.2d 430, 434-435 [330 P.2d 683], this statement was omitted from the CALJIC No. 78 instruction. We there held such an omission to be error in a prosecution for grand theft, a specific intent crime. Although we noted in *Arriola* that CALJIC No. 78 was intended to be used where the crime charged does not require specific intent, the basis of our holding that the instruction given constituted error was that there the court, in giving CALJIC No. 78, which is based on Penal Code section 22,[3] instructed only on the first sentence of the statute stating that an act is no less criminal by reason of having been committed by a person while in a state of voluntary intoxication, but did not instruct in the terms of the second sentence which contains the subject statement with respect to the effect of such intoxication where the existence of intent is an essential element of the crime. (See also *People* v. *Garcia* (1959) 169 Cal.App.2d 368, 371 [337 P.2d 100].)

In *People* v. *Spencer* (1963) 60 Cal.2d 64 [31 Cal.Rptr. 782, 383 P.2d 134], the Supreme Court considered a situation where, in a specific intent crime (robbery) prosecution, the trial court gave CALJIC No. 78 in toto but did not give

---

[3]Penal Code section 22 provides: ''No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular specics or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.''

CALJIC No. 78-B. The reviewing court, noting that CALJIC No. 78 ''could well leave a jury in a state of confusion or even with the impression that as a matter of law a defendant's voluntary intoxication can have no effect on the criminality of his conduct'' (p. 87), held that it was error to give CALJIC No. 78, and noted further that ''The subject instruction is intended to be, and should be, used only where the crime charged does not require specific intent.'' (P. 87.) The holding in *Spencer* was followed in *People* v. *Teale* (1965) 63 Cal.2d 178, 193 [45 Cal.Rptr. 729, 404 P.2d 209] [revd. on other grounds *sub nomine Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]], where it was held that it was error to give instructions similar to those condemned in *Spencer* in a specific intent crime prosecution, even though further instructions were given that properly stated the law.[4]

The *Spencer* and *Arriola* cases were relied upon in *People* v. *Deatherage* (1967) 249 Cal.App.2d 363, 368 [57 Cal.Rptr. 501]. Although no reference was made to *Teale* in *Deatherage,* it was held that in a specific intent crime prosecution (robbery), it was error to give CALJIC No. 78-A, which is substantially equivalent to CALJIC No. 78, and to refuse to give CALJIC No. 78-B.[5] In another case decided subsequent to *Deatherage* in the same appellate district, but in a different division, it was held in *People* v. *Fortman,* 257 Cal.App.2d 45, 52 [64 Cal.Rptr. 669], without citation of authority, that it was proper in a robbery case to give both CALJIC No. 78 and CALJIC No. 78-B.[6]

Neither *Spencer, Arriola,* or *Deatherage* considered what the effect might be of giving CALJIC No. 78-B as well as CALJIC No. 78 in a specific intent prosecution. *Deatherage* does not analyze this problem, but simply assumes that giving CALJIC No. 78 (or 78-A) is always error where the crime charged is a specific intent crime. This conclusion is supported by the holding in *People* v. *Teale, supra,* 63 Cal.2d 178, the rationale of which is that it is unwise to enunciate a doctrine that permits the giving of erroneous, misleading or confusing instruction provided they are compensated for or ''cured'' by

---

[4]The challenged instruction appears to be simliar to that given in *People* v. *Arriola, supra,* 164 Cal.App.2d 430, 434-435 (see *People* v. *Teale, supra,* 63 Cal.2d 178, 193, fn. 1). The ''further instructions'' referred to in *Teale* are not set forth, but an examination of the Attorney General's brief in that case shows that these instructions are substantially the same as CALJIC No. 78-B.

[5]A petition for a hearing by the Supreme Court was denied.

[6]A petition for a hearing by the Supreme Court was denied.

other, more specific instructions.[7] Accordingly, it is clear that in deciding *Spencer* and *Teale* the California Supreme Court has held that in a trial for a crime involving specific intent, such as robbery, instructions CALJIC Nos. 78 or 78-A, or similar instructions to the effect that intoxication does not excuse crime, are confusing and are apt to mislead the jury to believe that intoxication has no relevance to criminal conduct. We hold, therefore, that the trial court here erred in giving CALJIC No. 78 and that the error was not cured by giving the correct instruction, CALJIC No. 78-B, as well.

The next question is whether the error was prejudicial. In *Arriola, Spencer,* and *Deatherage,* it was held that the error in giving CALJIC No. 78 (or 78-A) was harmless because the evidence of intoxication was minimal. Here, defendant's witnesses presented substantial evidence that defendant was intoxicated during the weekend when the robberies occurred, but none of this evidence tended to show that defendant was intoxicated during the perpetration of the robberies. As stated, defendant relied solely on alibi as his defense, and neither his testimony nor his lawyer's argument asserted that he was drunk during the robberies, but rather claimed that he was so drunk during that weekend that he could not have been the man who perpetrated the robberies.

Of the five robbery victims, McKenna stated that defendant had glassy eyes, slumped, and walked slowly, and Cordova testified that defendant didn't look sober, had alcohol on his breath, and staggered once or twice. This testimony is the only direct evidence in the record that the perpetrator of the robberies was intoxicated and is minimal as the basis for an inference that defendant was too drunk to form the specific intent to rob. Further, the testimony of all the victims indicates that the robber was fairly calm and self-possessed, was able to reason ahead enough to be aware of the dangers posed by customers or third parties, and was generally in command of his faculties. As stated in *People* v. *Spencer, supra,* 60 Cal.2d 64, "These are not the actions of a man too drunk to form a specific intent to rob." (P. 89.) It is significant to note, moreover, that defense counsel himself argued, "Now, is it reasonable or probable to think that a man who was drunk, obviously drunk for three days, would have the ability, the

---

[7]We note, morever, that the editors of CALJIC point out instructions Nos. 78 and 78-A should not be given when the crime charged requires specific intent. (See CALJIC 1967 Pocket Part, note to instructions Nos. 78-78-D re Intoxication.)

mental capacity in order to commit these robberies which were well executed, I would say. They were well executed and were performed by an expert, an expert who coldbloodedly could go in, in possession of all his facilities [*sic*] and do what that man did.''

The only realistic conclusion warranted by the verdicts of guilty, therefore, is that the jury entirely disbelieved the array of defense witnesses and, accordingly, rejected the ''substantial evidence'' of intoxication. The remaining evidence of intoxication (the testimony of McKenna and Cordova, above quoted) was too minimal, as in *Arriola, Spencer* and *Deathcrage,* to raise the possibility that had the jury been correctly instructed they would have found that defendant lacked the capacity to form a specific intent. We conclude, therefore, that it is not reasonably probable that a different result would have been reached in this case had CALJIC No. 78 not been given. Accordingly, the error was not prejudicial. (Cal.Const., art. VI, § 13.)

### The Search and Seizure

Defendant claims, first, that since his arrest was at night for traffic offenses and the record does not demonstrate that the traffic warrants authorized a night arrest, his arrest and the search of his person incident thereto is invalid; and second, that the search of his pockets cannot be justified as incident to his arrest for traffic offenses.

■ Turning first to the validity of the arrest, we note that the police may not arrest for a misdemeanor at night unless the offense is committed in the officer's presence or the magistrate endorses upon the arrest warrant authorization to execute it at night. (Pen. Code, § 840; *People* v. *Koelzer,* 222 Cal.App.2d 20, 23 [34 Cal.Rptr. 718].) Defendant makes the challenge that the warrants did not authorize his arrest for the first time on appeal. He did not challenge the arrest warrants at the preliminary examination or at trial, although he was entitled to demand their production then. (See *People* v. *Stewart,* 189 Cal.App.2d 176, 179 [10 Cal.Rptr. 879].) His objection below, although directed in form to the validity of the arrest as well as to the search, did not challenge the warrants as such, nor did he demand their production. Had defendant made a timely objection to the validity of the arrest, the prosecution would have had the opportunity to demonstrate that the warrants authorized the instant arrests, if indeed they do so authorize. (Cf. *People* v. *Benjamin,* 154 Cal.App.2d 164, 168 [315 P.2d 896].) Defendant's failure to

demand production of the arrest warrants or otherwise to challenge their validity deprived the People of the opportunity to demonstrate that the arrest was authorized, and accordingly we hold that defendant may not now rely on this ground to secure reversal of his convictions. Defendant's reliance on *People* v. *Mills,* 251 Cal.App.2d 420, 422 [59 Cal. Rptr. 489] and *People* v. *Koelzer, supra,* 222 Cal.App.2d 20, 23 is misplaced. In *Mills,* the record affirmatively showed that the warrant did not comply with the statutory requirement; in *Koelzer,* the court did not consider the failure to demand production of the arrest warrants or otherwise to challenge their sufficiency.

Adverting to the search of defendant's person, we note that it is his position that after an arrest for traffic offenses under circumstances similar to those in this case, the police may frisk the arrestee or conduct a superficial search for concealed weapons, but may not go through his pockets or otherwise conduct a thorough exploratory search of his person, as was admittedly done in this case. Defendant relies on three California and two New York cases. *People* v. *Simon,* 45 Cal.2d 645 [290 P.2d 531], *People* v. *Ross,* 223 Cal.App.2d 196 [35 Cal.Rptr. 754], and *People* v. *Martines,* 228 Cal.App.2d 245 [39 Cal.Rptr. 526], all involved situations in which the officers stopped the defendant without having any reason to suspect him of any specific offenses, and then proceeded to search him. The court in each of these cases held that although a policeman may detain a person temporarily to question him and to make a cursory search for weapons if the circumstances warrant it, he has no right to make an exploratory search for evidence. *Martines* and *Ross* both relied on the rule enunciated in *People* v. *Mickelson,* 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658] ''that circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning,'' and ''*If the circumstances warrant it,* he may in self-protection request a suspect to alight from an automobile or to submit to a superficial search for concealed weapons.'' (Italics added.)

Adverting to the New York cases, we note that in *People* v. *Rodriguez,* 47 Misc.2d 551 [262 N.Y.S.2d 859, 864], the defendant was arrested for driving without a license and that the police searched him and found ''policy slips.'' The court held that the valid arrest for the traffic offense permitted a search for weapons but did not justify a complete search of

the defendant's person which uncovered evidence of other unrelated crimes. In *People* v. *Marsh,* 281 N.Y.S.2d 789, 792, it was not only held that the rule that a police officer may conduct a search contemporaneous to arrest is not applicable to an arrest for traffic violations, but also that the traffic offender may not be searched for weapons unless the officer suspects that he is dangerous or has probable cause for believing that the offender is guilty of a crime rather than merely a simple traffic infraction. (See also *People* v. *Zeigler,* 358 Mich. 355 [100 N.W.2d 456, 460].)

The People claim that we have essentially rejected the position taken by the New York cases in *People* v. *Stewart,* 189 Cal.App.2d 176 [10 Cal.Rptr. 879], and *People* v. *Kraps,* 238 Cal.App.2d 675 [48 Cal.Rptr. 89]. In *Stewart* the defendant was arrested pursuant to an outstanding traffic warrant and "In the routine search which followed this arrest five [marijuana] cigarettes were found in appellant's pockets, . . ." (P. 178.) The court did not discuss the scope of the search or go into the question of what sort of "routine search" is justifiable incident to a traffic arrest.

In *People* v. *Kraps, supra,* 238 Cal.App.2d 675, the defendant, who was standing in front of a used car lot at 3:10 a.m., was arrested on a traffic warrant after he was questioned as to his identity and the reason for being in the locality. The arresting officer conducted a "feel search," felt a bulge in a jacket pocket, asked defendant what it was, and upon being told that it was a "little container containing film," removed the film can from defendant's pocket. The officer, after shaking the can and concluding that it contained seeds or greens, opened it and discovered marijuana. We said in *Kraps* that the discovery of the marijuana was valid as incidental to a cursory search for weapons (pp. 679-680); but we did not hold that an exploratory search of an arrestee's person is permissible as incident to a traffic arrest.[8] It is clear that our holding in *Kraps* is based upon the fact that in the course of what we deemed to be a proper cursory search for weapons, the officer felt an object which caused a pocket to bulge and was therefore justified in ascertaining whether or not it was a weapon.[9]

---

[8] A petition for a hearing by the Supreme Court was denied.

[9] It should be noted that in *Kraps* the officer, prior to feeling the bulge in the defendant's pocket, asked the defendant to empty his pockets. The defendant's compliance with this request did not reveal any contraband. Accordingly, we did not discuss the propriety of the officer's ordering the defendant to empty his pockets.

Following the submission of this case the United States Supreme Court decided three "stop and frisk" cases (*Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] ; *Sibron* v. *New York,* 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889] ; and *Peters* v. *New York,* 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889]) upon which both parties have predicated reliance by supplemental briefs. These cases hold that a police officer who is investigating the suspicious behavior of an individual may make a reasonable search for weapons for his protection if he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. It was there held that the search must be confined to what is necessarily minimal to learn whether the person searched is armed, but may not consist of a general exploratory search for whatever evidence of criminal activity the officer may find.

In *Terry* and *Sibron* there was no probable cause to arrest the defendant for a crime. In the former, the self-protective search for weapons was held to be justified because the officer was able to point to the particular facts from which he reasonably inferred that the individual was armed and dangerous; in the latter, the search was held to be unjustified because the officer was not able to make such a showing. In *Peters* the officer had probable cause to arrest the defendant. Accordingly, it was held, upon the authority of *Preston* v. *United States,* 376 U.S. 364, 367 [11 L.Ed.2d 777, 780, 84 S.Ct. 881], that the officer had the authority to make a search incident to the arrest both for the purpose of ascertaining whether the defendant was armed or possessed other things which might be used to assault an officer or effect an escape but also " 'by the need to prevent the destruction of evidence of the crime.' " (P. 1905 [392 U.S. at p. 67, 20 L.Ed.2d at p. 937].) It should be here noted that *Peters* is factually similar to *People* v. *Kraps, supra,* 238 Cal.App.2d 675, in that the officer discovered the evidence in question while he was searching the defendant for weapons. We also note, in sum, that the gist of *Terry, Sibron* and *Peters* is that the scope of search and seizure must be reasonably related to the justification for their initiation.

█ Upon an analysis of the foregoing authorities, and the rationale upon which they are based, we conclude that the proper and salutary rule is as follows: a valid arrest for a traffic offense permits a search by the arresting officer of the arrestee's person for weapons, but does not justify a complete

search of his person for evidence of other unrelated crimes unless the officer has probable cause for believing that the traffic offender is guilty of a crime other than the traffic offense for which he is being arrested. In the latter instance, the arresting officer is entitled to conduct a contemporaneous search of the offender's person not only for weapons, but also for the fruits of or the implements used to commit crime. This rule harmonizes, in our opinion, the general rule that when an individual is lawfully arrested the police officer may conduct a contemporaneous search of his person ''for weapons or for the fruits of or implements used to commit the crime'' (*Preston* v. *United States, supra,* 376 U.S. 364 at p. 367 [11 L.Ed. 2d 777 at p. 780]), with the rule expressed in *People* v. *Marsh, supra,* 281 N.Y.S.2d 789 that a traffic offender may not be searched at all unless the officer suspects that he is dangerous or has probable cause for believing that the offender is guilty of a crime rather than merely a simple traffic infraction.

The rationale of *Marsh, supra,* that traffic offenders are usually noncriminals and therefore should not be subjected to the indignity of even a search for weapons must yield to the principle espoused in *Terry* and *Sibron, supra,* that a police officer may make a reasonable self-protective search for weapons if he has a constitutionally adequate reasonable ground for doing so, subject to the limitation that the scope of the search must be reasonably related to and justified by the circumstances which rendered its initiation permissible. In the case of a valid arrest the constitutional adequacy is supplied by the arrest itself within the limitations expressed in *Agnello* v. *United States,* 269 U.S. 20, 30 [70 L.Ed. 145, 148, 46 S.Ct. 4, 51 A.L.R. 409], as follows: ''The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, *as well as weapons and other things to effect an escape from custody,* is not to be doubted.'' (Italics added.) Under this rule it is apparent that the basis of a search for weapons is the security of the arresting officer and the prevention of the escape of the arrestee, since it is clear that the danger to the officer and the possibility of an escape are present if the arrestee possesses a weapon regardless of whether the weapon is in any way related to the crime for which he has been arrested. (See *People* v. *Rodriguez, supra,* 262 N.Y.S. 2d 859, 863.) Accordingly, the search for weapons is a

special exception to the rule that a search must be incidental to the cause of the arrest. This exception is dictated by the necessity of securing the safety of the officer and preventing an escape by uncovering weapons. The exception does not, however, extend beyond this purpose and does not justify a complete search of the person which would uncover evidence of unrelated crimes. (*People* v. *Rodriguez, supra,* at p. 864.)

In *Terry, supra,* the Supreme Court recognized the existence of an immediate interest in a police officer's "taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him," and went on to say: "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives."[10] (P. 1881 [392 U.S. at p. 23, 20 L.Ed.2d at p. 907].)

We take judicial notice, moreover, of the fact that police officers have been killed or assaulted while making arrests for traffic offenses and that the motivation for these killings and assaults has been the desire to escape from arrest or custody. It is likewise a matter of judicial knowledge that arrests for traffic offenses frequently disclose that the arrestee is wanted by the authorities for the alleged commission of another crime or crimes or that he is a fugitive from justice. That there is motivation in such a person to escape arrest and prosecution for these crimes needs no amplification. Accordingly, within the narrowly drawn authority to search for weapons for self-protection and to prevent escape, it seems reasonable that a police officer should not be proscribed from conducting a carefully limited search for weapons which might be used to assault him. Within this limitation it seems to us that a proper balance is struck between the salutary immediate interest of protecting an officer from an assault and the indignity attendant a search for weapons.

Adverting to the instant case in the light of these principles, we conclude that the arrest of defendant for traffic

---

[10]The court took judicial notice of the number of law enforcement officers who were killed in a seven-year period beginning with 1960, of the number of assaults on police officers in 1966, and of the easy availability of firearms to potential criminals in this country.

offenses, standing alone, warranted no more than a carefully limited search for weapons. Nor do we believe that we should reach a different conclusion because the arrest is based upon warrants for traffic offenses rather than for arrests at the scene for such offenses. We note, moreover, that the record in this case does not indicate the nature of the traffic offenses for which the warrants were issued, that is, whether they were for a violation of a promise to appear for a moving traffic offense (see Veh. Code, §§ 40303, 40304, 40500, 40508, 40514) or upon a notice of violation for a standing or parking offense (see Veh. Code, §§ 41102, 41103). In any event, we perceive no difference in dealing with a traffic offender who is given a written notice to appear in court for a traffic violation at the scene of the offense and one who is taken into custody sometime later upon a warrant for his arrest for violating his written promise to appear. As stated in *People* v. *Marsh, supra,* 281 N.Y.S.2d 789, 793, ''The warrant does no more than authorize the police officer to make an arrest for an offense which he did not witness. It does not give him any greater power to conduct a search than he would have possessed had he actually seen the infraction and thereupon stopped the offender.''

The arresting officer did, however, have probable cause in the instant case for believing that defendant was guilty of a crime other than the traffic offenses for which he was being arrested. Therefore, he was justified in conducting a thorough search of defendant's person. Although, in arresting defendant, the officer announced that he was doing so on the basis of traffic warrants, he had probable cause for believing that defendant had committed the crime of robbery. The information imparted to the police by Mr. Elseth concerning his observations at the time of the robbery of the Chevron station on the evening of February 7 sufficed to give the police probable cause to believe that the Negro driving the 1954 Studebaker sedan was the perpetrator of the robbery. Defendant's identification as the owner of the car, defendant's description and residence address, the description of the Studebaker, and the information that defendant was a robbery suspect were imparted to Officer Garrison at the police lineup training on the same evening. Since this information was received through official channels, Garrison was justified in relying upon its trustworthiness. (*People* v. *Kraps, supra,* 238 Cal.App.2d 675, 679; *People* v. *Jackson,* 202 Cal.App.2d 569, 574 [21 Cal.Rptr. 44]; *People* v. *Schellin,* 227 Cal.App.2d 245, 251 [38 Cal.Rptr.

593].) Garrison's approaching the car with a drawn gun and his handcuffing of defendant upon arresting him are circumstances indicating that the arrest was based not solely on the traffic warrant, but also on the strength of the information concerning the robbery that Garrison had received at the lineup training. Accordingly, we conclude that the arrest was justified apart from and independent of the warrants. (See *People* v. *Chimel,* 68 Cal.2d 436, 440 - 443 [67 Cal.Rptr. 421, 439 P.2d 333]; *People* v. *Castro,* 249 Cal.App.2d 168, 174-175 [57 Cal.Rptr. 108]; and see *Giordanello* v. *United States,* 357 U.S. 480, 487-488 [2 L.Ed.2d 1503, 1510-1511, 78 S.Ct. 1245].) [11]

The fact that Garrison did not inform defendant that he was under arrest for robbery but only informed him that he was arrested pursuant to the warrant for traffic offenses does not detract from the validity of the arrest since the arrest pursuant to the warrant was a valid arrest. The arrest, moreover, was in substantial compliance with Penal Code section 841 which requires that ''The person making the arrest must inform the person to be arrested of the intention to arrest him, of the cause of the arrest, and the authority to make it, . . .'' That section only requires that the officer inform the person to be arrested ''of the *cause* of the arrest,'' (italics added) and not of the nature of each offense for which he is being arrested, unless so requested by the person he is arresting, since section 841 also provides that ''The person making the arrest must, on request of the person he is arresting, inform the latter of the offense for which he is being arrested.'' Here the arrest upon the traffic warrant was a sufficient cause for the arrest; defendant was advised of this fact; and no request was made by defendant that he be informed of the specific offense for which he was being arrested. Accordingly, the officer was justified in not elaborating on the specific offenses. It is reasonable to conclude that an arrest of a suspected robber upon a traffic warrant is less apt to provoke a hostile confrontation than an announced arrest for robbery. Supportive of our conclusion is *Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36]

---

[11] In the *Chimel* and *Giordanello* cases it was held that an arrest based upon probable cause sufficient to support a warrantless arrest is valid despite an invalid warrant. In *Castro,* cited with approval in *Chimel,* a search undertaken pursuant to an invalid search warrant, which could otherwise be upheld as an incident to arrest based on probable cause, was held to be valid.

738

where, in construing the application of section 841, our Supreme Court held that since a person who was arrested in a public bar made no outcry or objection, it could be inferred that the person making the arrest was a police officer and that his purpose was to make an arrest, and, therefore, under these circumstances, it was immaterial that the person arrested was not informed of the officer's authority and purpose. (See *People v. Valenzuela*, 171 Cal.App.2d 331, 333-334 [340 P.2d 685].)

## Alleged Misconduct

Defendant asserts prejudicial misconduct on the part of both the prosecutor and the court. Turning to the alleged misconduct on the part of the prosecutor, defendant first contends as follows: In his summation, defense counsel argued that defendant had an "unblemished record" and had "never been in trouble before" and was therefore unlikely to have committed the instant offenses. On rebuttal argument, the district attorney argued that defendant had said on the stand that he had been arrested for grand theft. Defense counsel objected to this remark, but the trial court let it stand. Defendant's testimony on the stand, to which the district attorney was apparently referring, was as follows: "Well, I have traffic tickets; I got—I had a receiving once, but it was only a misdemeanor as far as I was concerned. The man that really took the stuff, he testified that he took it." This testimony had been stricken by the court when the district attorney objected that it was hearsay. Defendant now argues that this testimony was hardly a basis for the district attorney's "inflammatory" remark that defendant had been arrested for grand theft, which crime defendant characterizes as a far more serious-sounding matter than a misdemeanor conviction for receiving stolen goods. He also claims that this statement violated the rules that a defendant's credibility may only be impeached by felony convictions, and that evidence of other crimes is inadmissible to prove that the defendant has a disposition to commit the crime charged. The People, in turn, argue that the comment was a permissible attempt by the district attorney to correct the misconceptions that might have been engendered by defense counsel's inaccurate statement that defendant had an unblemished record.

We agree with defendant that the district attorney's statement was misconduct and should have been stricken on request. The prosecutor had no license to correct a misstatement of defense counsel with a further misstatement of his own. (See *People v. Modesto*, 66 Cal.2d 695, 714, fn. 16 [59

Cal.Rptr. 124, 427 P.2d 788].) Moreover, only felony convictions may be used to impeach credibility and evidence of other crimes is inadmissible to prove disposition to commit crimes charged even if the defendant puts his character in issue. (See *People* v. *Alverson,* 60 Cal.2d 803, 810 [36 Cal.Rptr. 479, 388 P.2d 711]; *People* v. *Carner,* 144 Cal.App.2d 687, 691 [301 P.2d 623].)

■ Defendant next contends that the prosecutor improperly argued facts not in evidence. No evidence was introduced as to the distance from the Douglas Oil station robbed at approximately 7 o'clock Monday evening, to the liquor store where witness Elseth allegedly saw defendant's car parked at about 6:50. Yet the prosecutor argued that this distance was an "easy ten minute drive." Defendant further argues that this testimonial statement was prejudicial, since after its initial deliberation the jury requested "the time of each robbery and sequence of happening," which the court read to the jury, and that before reading these facts to the jury the trial court stated: "I see that one of the jurors has some notes—a note pad, and I think it might be wise if you did make notes of what I'm now about to say." Defendant argues that in essence the court appointed one of the jurors to take notes, thereby delegating to one juror what should have been the function of all 12, and thus compounding the prejudicial effect of the prosecutor's testimonial statement.

■ Although it was improper for the district attorney to make a testimonial argument by referring to matters not in evidence (*People* v. *Brophy,* 122 Cal.App.2d 638, 652-653 [265 P.2d 593]), such reference is not deemed prejudicial misconduct if it is the result of an inadvertence or honest mistake. (*People* v. *Willard,* 150 Cal. 543, 551 [89 P. 124]; *People* v. *Davenport,* 17 Cal.App. 557, 563 [120 P. 451].) ■ In the instant case we have no way of knowing whether the reference was inadvertent; nor has defendant demonstrated that it is prejudicial. Moreover, it is significant that no objection was interposed to such reference by defense counsel. Had he done so the court could have corrected the error by admonishing the prosecutor and ordering the objectionable remark stricken. Accordingly, we do not think that defendant may now base error on this ground.[12] As to the court's suggesting

[12] In this connection the People ask us to take judicial notice of the distance between the two points involved in the City of Oakland, which distance the People claim is less than three miles. Many factors besides the actual distance, however, may bear on whether an "easy ten minute drive" is involved and therefore we decline to take judicial notice of this factual matter.

that a juror continue to take notes, we fail to see in what manner defendant can demonstrate any prejudice arising out of this incident. The trial judge's remark does not amount to an appointment of one juror to take notes but can be interpreted to have reference to all the jurors. The record does not establish that only one juror took notes, nor does it establish that the other 11 jurors delegated their responsibilities in this matter to the note-taking juror. Further, there is no indication that the jurors were specifically concerned about the distance from the point where defendant's car was observed to the gas station robbed at approximately 7 p.m., and therefore there is no support for defendant's argument that the court's direction to take notes compounded the error of the prosecutor's comment on matters not in evidence.

In summary, the only misconduct shown is the prosecutor's improper reference to defendant's supposed ''arrest for grand theft.'' We do not deem this error to be prejudicial. Since defendant had himself referred to his prior for ''receiving,'' the prosecutor did not actually bring evidence of an extrinsic crime before the jury for the first time, but rather only emphasized this factor additionally. Further, although defendant argues that an arrest for grand theft is more ''serious-sounding'' than a conviction of ''receiving,'' the reverse might just as easily be true, that the jury would have been more impressed by a prior conviction than by a mere arrest, for whatever crime. Moreover, since defendant admitted on cross-examination that he had been previously convicted of murder without malice in Texas, it is doubtful that the argument as to whether defendant had an ''unblemished record'' could have been of any significance to the jurors. In this case the evidence against defendant on the robbery charges is overwhelming; we have five positive identifications by the victims plus the fact that the *modus operandi* in each of the robberies was pretty much the same. Under these circumstances we conclude that the district attorney's misconduct, while a serious breach of the rules governing criminal trials, did not in all likelihood have an ascertainable effect on the result in this case.

### Physically Impossible Evidence

Defendant contends that the conviction on count four rests on physically impossible evidence because the victim, Cordova, testified that the man who robbed him did not have a mustache, whereas McKenna, robbed earlier that same evening, testified that the robber did have a mustache, and the

lineup shows that defendant does have a mustache. Further, defendant points out that during the 6:30 p.m. and 7 p.m. robberies on Monday, the robber was wearing a hooded nylon ski jacket, whereas during the robbery of Cordova he wore unkempt khaki clothes, a pullover sweater, and a hat. As the People aptly point out, while it may have been physically impossible for defendant to have grown a mustache overnight, it is not physically impossible that Cordova could have been mistaken about whether his assailant had a mustache or not, especially in view of the fact that the robbery took place late at night, and, as may be seen from the lineup photograph, defendant's mustache is not very prominent. As to the differences in clothing, it is obvious that defendant could have changed his clothes between the robbery at 7 p.m. and that at 10:15 p.m. We conclude, therefore, that there is no "physical impossibility" inherent in the conviction on count four and that defendant's argument is one that should properly have been addressed to the jury.

## The Lineup

Defendant contends that since one of the victims, Cordova, claimed that his assailant did not have a mustache, persons without mustaches should have been included in the lineup. He theorizes that in the instant case Cordova selected defendant out of the lineup because defendant was the least hirsute of the persons in the lineup. Defendant concedes that the new rules declared by the United States Supreme Court regarding lineups (*United States* v. *Wade*, 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California*, 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]) do not apply retroactively to the lineup in this case (*Stovall* v. *Denno*, 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; *People* v. *Feggans*, 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21]), but argues that in the particular confrontation involved defendant was denied due process of law in violation of the Fourteenth Amendment. (See *Stovall* v. *Denno, supra,* at p. 299 [18 L.Ed. 2d at p. 1204]; *People* v. *Caruso,* 68 Cal.2d 183, 185 [65 Cal.Rptr. 336, 436 P.2d 336].)

We do not think that there was a due process violation in this case since it cannot be successfully argued that a lineup in which the participants are substantially alike violates due process. On the contrary, a lineup would appear to be unfair in which the subject differed materially in some respects, such as race, from most or all of the other participants, since such isolation of the suspect would tend to increase the chances of

his being noticed and identified. (Cf. *People* v. *Caruso, supra,* 68 Cal.2d 183.) Here all the participants were bearded or had some facial hair, and defendant does not have noticeably less hair than subjects four and five, although he does have less hair than subjects one and two. We do not believe that the lineup required the addition of an individual without facial hair in order to render it fair.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied August 6, 1968, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied September 5, 1968.